Helen D. MILLER, Individually and as Executrix of the Estate of Alton G. Miller, Deceased, Shapiro, Bernstein & Co., Inc., Gershwin Publishing Corporation, Edward B. Marks Music Corporation, Miller Music Corporation, Lewis Music Publishing Company, Inc. and Mutual Music Society, Inc., Plaintiffs,

v.

Sam GOODY, Sidney Turk and Harold Grossbardt, individually and doing business as Colony Record & Radio Center, Colony Record & Radio Center, Inc., Arcade Music Shop, Inc., Rivoli Music Center, Inc., Portem Distributing, Inc., and Joseph Krug, individually and doing business as A. F. N. Record Co., Defendants.

United States District Court
S. D. New York.
March 16, 1956.

See also, 125 F.Supp. 348.

Abeles & Bernstein, New York City, attorneys for plaintiffs, Shapiro, Bernstein & Co., Inc., Gershwin Publishing Corporation, Edward B. Marks Music Corporation, Miller Music Corporation, Lewis Music Publishing Company, Inc. and Mutual Music Society, Inc. by Julian T. Abeles, New York City, of counsel.

Telsey, Lowenthal, Rothenberg & Mason, New York City, for defendant, Sam Goody, by Leon G. Telsey, Abraham M. Lowenthal, New York City, of counsel.

Raucher & Leftoff, New York City, for defendant Portem Distributing, Inc. by Morris B. Raucher, New York City, of counsel.

IRVING R. KAUFMAN, District Judge.

Some time in 1951, defendant Joseph Krug, a phonograph record salesman, came into possession of certain acetate disks recording propaganda radio broadcasts made by Glenn Miller and orchestra when Mr. Miller was a major in the United States Army during World War II. Krug tape-recorded the selections on

those disks, and from the tapes he made the matrices, plates, molds, stamps, etc., necessary for the manufacture of records; then, doing business as the A. F. N. Record Company, he commenced to manufacture and sell two ten inch long-play records of the Miller performance. The jackets in which the records were sold carried a picture of Glenn Miller in his army uniform and the captions, "Major Glenn Miller and His A. E. F. Orchestra", "An AFN Presentation". The labels on the records themselves were similarly captioned.

■ Of the thirteen musical selections contained on both of these records, nine were copyrighted musical works whose copyrights were held by various musical publishers.[1] These copyright proprietors had each previously permitted the recording of the selections involved; therefore, under the so-called compulsory licensing provisions of the copyright law, 17 U.S.C. § 1(e) and § 101(e), which deal specifically with mechanical reproduction of musical compositions, Krug was entitled to manufacture recordings of these selections provided he filed notice of his intention to do so, and provided he paid the copyright proprietors a royalty of 2 cents for each record manufactured. Krug, however, neither filed the requisite notice nor paid the statutory royalties, and he thereupon became an infringer and subject to statutory damages.[2]

1. The selections and publisher-proprietors were as follows:

| Name of Publisher | Title of Composition |
| --- | --- |
| Shapiro, Bernstein & Co., Inc. | "In the Mood" |
| Gershwin Publishing Corporation | "Summertime" |
| Edward B. Marks Music Corporation | "Poinciana" |
| Miller Music Corporation | "Great Day" |
| Lewis Music Publishing Company, Inc. | "Tuxedo Junction" |
| Mutual Music Society, Inc. | "American Patrol" |
| "     "     "     " | "Song of the Volga Boatman" |
| "     "     "     " | "Anvil Chorus" |
| "     "     "     " | "A String of Pearls" |

2. The two mechanical reproduction subsections of the copyright law provide:

"§ 1. *Exclusive rights as to copyrighted works*

\* \* \* \* \*

"(e) To perform the copyrighted work publicly for profit if it be a musical composition; and for the purpose of public performance for profit, and for the purposes set forth in subsection (a) hereof, to make any arrangement or setting of it or of the melody of it in any system of notation or any form of record in which the thought of an author may be recorded and from which it may be read or reproduced: *Provided,* That the provisions of this title, so far as they secure copyright controlling the parts of instruments serving to reproduce mechanically the musical work, shall include only compositions published and copyrighted after July 1, 1909, and shall not include the works of a foreign author or composer unless the foreign state or nation of which such author or composer is a citizen or subject grants, either by treaty, convention, agreement, or law, to citizens of the United States similar rights. And as a condition of extending the copyright control to such mechanical reproductions, that whenever the owner of a musical copyright has used or permitted or knowingly acquiesced in the use of the copyrighted work upon the parts of instruments serving to reproduce mechanically the musical work, any other person may make similar use of the copyrighted work upon the payment to the copyright proprietor of a royalty of 2 cents on each such part manufactured, to be paid by the manufacturer thereof; and the copyright proprietor may require, and if so the manufacturer shall furnish, a report under oath on the 20th day of each month on the number of parts of instruments manufactured during the previous month serving to reproduce mechanically said musical work, and royalties shall be due on the parts manufactured during any month upon the 20th of the next succeeding month. The payment of the royalty provided for by this section shall free the articles or devices for which such royalty has been paid from further contribution to the copyright except in case of public performance for profit. It shall be the duty of the copyright owner, if he

Among Krug's record dealer customers were Portem Distributing, Inc. and Sam Goody, the latter reputed to be one of the largest record dealers in the world. Both Mr. Robert E. Pare, president of Portem Distributing, Inc. and Mr. Goody had been acquainted with Mr. Krug in his capacity as a record salesman for the Colony Record & Radio Center, but both assert that they found nothing surprising or suspicious when it appeared that he was also in the business of manufacturing records under his own label. They made no effort to ascertain whether he had fulfilled his obligations under the copyright law, nor, seemingly, did they make inquiry as to Krug's authority to use Glenn Miller's picture, and to re-record his performance.[3] Both assert that because of the large number of record manufacturers in the field, ranging from large-scale producers to small operations similar in size to Krug's, and because of the compulsory licensing provisions of the copyright law, they cannot and do not attempt to ascertain whether every manufacturer with which they deal has taken the proper steps required under that law.

In May of 1954, Helen D. Miller, who is Glenn Miller's widow and executrix of his estate, joined with the six publishing companies who between them own the nine musical copyrights which had

---

uses the musical composition himself for the manufacture of parts of instruments serving to reproduce mechanically the musical work, or licenses others to do so, to file notice thereof, accompanied by a recording fee, in the copyright office, and any failure to file such notice shall be a complete defense to any suit, action, or proceeding for any infringement of such copyright.

"In case of failure of such manufacturer to pay to the copyright proprietor within thirty days after demand in writing the full sum of royalties due at said rate at the date of such demand, the court may award taxable costs to the plaintiff and a reasonable counsel fee, and the court may, in its discretion, enter judgment therein for any sum in addition over the amount found to be due as royalty in accordance with the terms of this title, not exceeding three times such amount.

"The reproduction or rendition of a musical composition by or upon coin-operated machines shall not be deemed a public performance for profit unless a fee is charged for admission to the place where such reproduction or rendition occurs."

"§ 101. *Infringement*

\* \* \* \* \*

"(e) *Royalties for use of mechanical reproduction of musical works.*—Whenever the owner of a musical copyright has used or permitted the use of the copyrighted work upon the parts of musical instruments serving to reproduce mechanically the musical work, then in case of infringement of such copyright by the unauthorized manufacture, use, or sale of interchangeable parts, such as disks, rolls, bands, or cylinders for use in mechanical music-producing machines adapted to reproduce the copyrighted music, no criminal action shall be brought, but in a civil action an injunction may be granted upon such terms as the court may impose, and the plaintiff shall be entitled to recover in lieu of profits and damages a royalty as provided in section 1, subsection (e), of this title: *Provided also*, That whenever any person, in the absence of a license agreement, intends to use a copyrighted musical composition upon the parts of instruments serving to reproduce mechanically the musical work, relying upon the compulsory license provision of this title, he shall serve notice of such intention, by registered mail, upon the copyright proprietor at his last address disclosed by the records of the copyright office, sending to the copyright office a duplicate of such notice; and in case of his failure so to do the court may, in its discretion, in addition to sums hereinabove mentioned, award the complainant a further sum, not to exceed three times the amount provided by section 1, subsection (e), of this title, by way of damages, and not as a penalty, and also a temporary injunction until the full award is paid."

These two sections have remained unchanged since the Copyright Act of 1909, although initially Section 101(e) was called Section 25(e).

3. It is still uncertain whether Krug was required to get authority from the Miller estate, and this phase of the case is yet to be tried. The uncertainties surrounding the law in this area of "dubbing" recordings will be discussed in note [5] infra.

been infringed, and together they brought suit against *Krug* individually and doing business as A.F.N. Record Company, and against Sam Goody, Portem Distributing, Inc. and several other record dealers who had allegedly bought infringing records from Krug and resold them to the public. Helen D. Miller's complaint was based on unfair trade practices and unfair competition as she alleged that she had the exclusive right to control the recording of Glenn Miller's performances, that she and her husband before her had negotiated exclusive contracts with RCA Victor which fact was well known in the industry, that Krug's records were of inferior quality, and that he and the defendant dealers, therefore, had damaged the value of Glenn Miller's name and reputation by selling these technically inferior recordings, and had also interfered with and damaged her property rights in the name, likeness and music of Glenn Miller, which rights have earned her substantial royalties from RCA Victor and other companies which have paid to use the name and likeness of Glenn Miller in the motion picture, radio and sheet music industries. The complaint of the publishers was based on Krug's violation of the copyright law and on the resale by the dealer defendants of those infringing records, which sale, the publishers assert, was also a violation of the copyright law subjecting the dealers to liability for statutory damages.

The plaintiffs proceeded first against Krug, and on October 5, 1954, the publisher plaintiffs made a motion for a default judgment against Krug who had failed to answer their complaint or take any other steps with respect to it. The default was granted, and by its terms, Krug was enjoined from infringing the musical copyrights involved; a Special Master was appointed to take testimony and compute the amount of damages and royalties owing; and Krug was ordered to turn over to the Special Master all the materials with which he had made the infringing records, provided that upon satisfactory proof to the Court that Krug had filed the requisite notice and paid the royalties found due, the injunction and impounding order would be lifted. Miller v. Goody, D.C.S.D.N.Y. 1954, 125 F.Supp. 348. Computation proceedings were started, and Krug was called as a witness before the Special Master; before the royalties owing could be ascertained, however, the publisher plaintiffs and Helen D. Miller entered into a stipulation of settlement with Krug. Under its terms, the injunction against making the offending records was made permanent; Krug turned over to the plaintiffs all the materials with which he had manufactured, labeled and jacketed the recordings; and he paid the plaintiffs other than Helen D. Miller $2,000. "on account of the costs and expenses incurred * * * in their proceedings" against him. All the plaintiffs, while discharging Krug and his heirs, executors and administrators from any further liability arising from this cause of action expressly reserved all their rights against the other defendants in the case.

By the present motion, the plaintiff publishers are pressing their cause of action separately from that of Helen D. Miller. They seek summary judgment against Sam Goody and Portem Distributing, Inc., two of the defendant dealers. Although the publishers' cause of action has its roots in Sections 1(e) and 101(e) of the copyright law, which sections deal with the mechanical reproduction of music, they seek to recover damages provided for in Section 101(b) of the Act. This latter section, which deals with copyright infringement generally, provides for a minimum recovery of $250 per infringement (with certain enumerated exceptions) where infringement is found but the number of infringing copies sold or published is uncertain. The publishers assert that the dealer defendants infringed their copyrights when they sold the A.F.N. records. The publishers urge that since each defendant admits the sale of some of these records (though the number sold is in dispute), and since under the

copyright law intention to infringe is immaterial, they are entitled to a recovery of $250 per copyright from each defendant.

The two dealer defendants herein admit in their brief that "the sale or vending of an unauthorized copy of a copyrighted article by anyone is an infringement of the copyright irrespective of the position of the vendor in the distributive process, his bona fides, his innocence, or the unknown peril to which he may have been subjected." And this is undoubtedly the law. F. W. Woolworth Co. v. Contemporary Arts, 1952, 344 U.S. 228, 73 S.Ct. 222, 97 L.Ed. 276; DeAcosta v. Brown, 2 Cir., 1944, 146 F.2d 408. Defendants agree, therefore, that the question of their asserted innocence of evil intent is immaterial, and that the case is a proper one for determination by summary judgment since no facts are in issue nor is there need for adjudicating credibility of witnesses. They contend, however, that upon the law the judgment must be in their favor because a record is not a copy of a musical composition within the meaning of the copyright law, and the sale of that which is not an infringing copy is not a violation of the copyright law under Section 101(b) or any other section. They urge that Congress specifically refused to label a recording as a copy and thereby give the musical copyright proprietor complete protection from mechanical reproduction of his music; instead, Congress made specific limited provisions to ensure that record manufacturers pay some price for the use of a composer's work. The dealers contend that those limited provisions, Sections 1(e) and 101(e) are the only rights given to the copyright proprietor when dealing with mechanical reproductions, and they provide for recovery solely against the manufacturer, and then only in certain specified amounts dependent on the number of records manufactured, there being no minimum penalty provision as there is for unauthorized copying. In sum, the defendants argue that under the law the non-manufacturing seller, no matter what the state of his knowledge, is not accountable to the proprietor or to anyone for his sale of infringing records.

A painstaking analysis of the legislative history of the Copyright Act of 1909 and the contemporary comment about it, and a thorough study of the history of the recording industry since that Act went into effect, have led me to conclude regretfully that the defendants' contentions must be sustained. In reaching this conclusion, I must confess that I have not been moved by defendants' protestations of innocent intent, which I question: Krug's lack of business address, business stationery or even a telephone listing, and his sale of Glenn Miller recordings under an unknown label and in jackets which stated that the records had been taken from radio broadcasts without any showing of approval from the Miller estate, were clear indications that he was a record pirate.[4] While the question of whether a performer like Mr. Miller is protected from such re-recordings has not yet been definitively settled,[5] and is indeed the subject of another phase of this lawsuit, it is fair-

---

4. Record pirates or "diskleggers" as they have been called, are manufacturers who re-record or "dub" recordings made by legitimate companies and sell them competitively. In this manner, they avoid having to pay the performers for their time, and they have the benefit of the initial recording company's talents in getting the finest rendition possible. Ordinarily, they also omit payment of the copyright, although, as far as the copyright law is concerned, even a pirate has the right to record copyrighted musical compositions provided he files notice of intent and pays the royalties.

5. Compare Waring v. WDAS Broadcasting Station, 1937, 327 Pa. 433, 194 A. 631; RCA Mfg. Co. v. Whiteman, 2 Cir., 114 F.2d 86, certiorari denied Whiteman v. RCA Mfg. Co., 1940, 311 U.S. 712, 61 S.Ct. 393, 85 L.Ed. 463; Capitol Records v. Mercury Records Corp., 2 Cir., 1955, 221 F.2d 657, Hand, J. dissenting. The question of the rights of performers in their recorded performances, and of recording companies in their talent in making initial recordings, as against record pirates and others who broadcast the original recordings, has been the subject of numerous legal arti-

ly well known in the trade that most record pirates usually do not pay the necessary royalty fee, particularly when they are operating on a small scale as was Mr. Krug. Note, Piracy on Records, 5 Stanford L.Rev. 433 (1952–53). It appears, however, that the law is such that regardless of defendants' awareness of Mr. Krug's probable infringement of any copyrighted selections on the recordings, their acceptance and resale of these records did not violate the copyright laws.[6]

Under the copyright laws existing prior to 1909, "the author, inventor, designer, or proprietor of any book, map, chart, dramatic or musical composition [had] the sole liberty of printing, reprinting, publishing, completing, copying, executing, finishing and vending the same." White-Smith Music Co. v. Apollo Co., 1907, 209 U.S. 1, 9, 28 S.Ct. 319, 52 L.Ed. 655. This is similar to the protection accorded a copyright proprietor today under 17 U.S.C. § 1(a); yet, in the Apollo case, supra, the Supreme Court held that this list of rights did not protect the copyright proprietor from one who mechanically reproduced the sound of a musical composition on a piano roll or similar mechanical device [e. g. recordings]. While agreeing that the purpose of the copyright laws was to protect intellectual conceptions, the Court maintained that it was the tangible result of the conception which alone was protected from copying, and the tangible result of the composer's art was the sheet music by which one versed in the art could read his score. The Court defined a copy of a musical composition as " 'a written or printed record of it in intelligible notation.' " The appeal of a copy must be to the eye, not the ear. It said, "It may be true that in a broad sense a mechanical instrument which reproduces a tune copies it; but this is a strained and artificial meaning." Id., 209 U.S. at page 17, 28 S.Ct. 323. The Court found its conclusion regrettable in that record and piano roll manufacturers were thus getting a profitable use of musical compositions without paying value therefor, but it stated that this was a consideration properly addressed to the legislature and not to the courts.[7]

In the Copyright Act of 1909, Congress undertook to remedy this inequity and to grant some measure of protection to musical copyright proprietors against those who were profiting by making recordings of their compositions which were incapable of being read but which served as parts of mechanisms which reproduced such compositions in sound.

cles. See e. g. Chafee, Reflections on the Law of Copyright, 45 Col.L.Rev. 719, 733 et seq. (1945); Comment, Protection of the Performing Artist's "Interpretative Rendition" Through the Arranger's Copyright, 37 Ill.L.Rev. 245 (1942–43); Note, Rights of Performers and Recorders Against Unlicensed Record Broadcasts, 49 Yale L.J. 559 (1939–40). The question of whether there is any common law protection for these artists and recording companies either via common law copyrights or unfair competition has been considered by few courts so far and different conclusions have been reached. The weight of legal comment seems to be that solution will have to be sought by amendment of the copyright law which, at present, does not permit the copyrighting of a recording. These articles point out that this problem has been before Congress many times but because of the many conflicting interests involved, a satisfactory solution has not been reached and the copyright law has remained unchanged.

6. A corollary to this conclusion, to be discussed *infra*, is that the defendants did not violate any common law rights of the copyright proprietors either, because as will be pointed out, the proprietors are in an area wholly governed by statute and cannot make even the tenuous claims to common law protection in the absence of statute which are being made by recording companies and performing artists in their fight against pirates.

  This conclusion makes unnecessary any consideration of other contentions raised by the defendants to the effect that the settlement with Krug released the dealers from liability.

7. It must be noted that the Court addressed itself wholly to the question of statutory interpretation, and the question of whether Congress could constitutionally provide that a recording was a copy was not before it.

Congress did not, however, include mechanical reproduction of music in its definition of a copy, although to have done so would have been an easy solution, granting the musical proprietor complete copyright protection against mechanical reproduction. The reasons for not defining a recording as a copy were spelled out in the House Report accompanying the proposed bill.[8] Congress feared the creation of a giant music monopoly in which the big publishing houses, which owned most musical copyrights, would negotiate with the great recording companies for exclusive recording contracts —and such negotiations had actually been started in anticipation of a more favorable Supreme Court decision in the Apollo case. To avoid a music trust injurious to public and composer alike, and to still protect the composer in his work was the problem Congress faced. Its solution was to provide that the musical copyright proprietor could forbid all mechanical reproduction of his music, but once he licensed one company to record it, then all other manufacturers could so record provided they filed a notice of intent and paid a royalty of 2 cents per record. Manufacture in violation of these provisions was made enjoinable, and damages up to three times the amount of royalties due were to be awarded in cases of infringement. The report flatly stated, "It is not the committee's intention to extend the right of copyright to the mechanical reproductions themselves, but only to give control over the manufacture and use of such devices." Although the bill had been unanimously endorsed by the committees of both Houses of Congress, it did not pass unchallenged. Debate on the House floor, as in the committee, was centered on the "canned music" provisions. Detractors argued that putting a flat price on the copyright proprietor's property, i. e. 2 cents a record, was an unconstitutional infringement of property rights, but the bill's defenders pointed out that copyright rights are strictly statutory, that prior to this bill the composer had no rights against mechanical reproduction, and Congress in giving him a right could limit or condition it. Further, they pointed out, the constitution speaks of promoting progress in science and the arts as the purpose of copyright protection, and a grant of right which could lead to a music monopoly would be a deterrent to such progress. Again and again, during debate references were made to the manufacturer's rights and duties, and it was clear that the committee considered that the 2 cents plus treble damages was all the relief it was providing, and that this was to be payable by the manufacturer. Cong.Record, March 31, 1909, pp. 3765-3767, 3768-3770. The bill, as recommended and understood by the committee, was enacted into law and its provisions still govern today.

Legal commentators have criticized this law because of the limited protection given to musical copyright proprietors. In Shafter, Musical Copyright, pp. 236-244 (1932), the royalty provisions are discussed solely in terms of the manufacturer, and Shafter points out that one disadvantage of the present law is the lack of an award for minimum infringement. In other instances of copyright law, he says, intentions and result are immaterial; if the infringement takes place, there is a minimum award—but this is not so in mechanical reproduction cases. He adds that fly-by-night manufacturers who falsify their books as to the number of records manufactured are a serious problem in the industry. Similar critical comment is made in Weil, American Copyright Law, pp. 63, 96-97, 489 (1917) which criticizes the fact that the proprietor is without apparent remedy against an insolvent manufacturer, except, of course, for injunction. No mention is made of a possible alternative recovery from a seller. Congressional unfriendliness towards extending

8. House Report No. 2222 on H.R. 28192, 60th Cong. 2d Session. Senate Report 1108 dealing with the same bill merely states that it adopts H.R. No. 2222 in toto.

the copyright of musical compositions to mechanical reproductions, and the failure of efforts to persuade Congress to provide less meagre relief were recently noted by the Court of Appeals for the Second Circuit in Edward B. Marks Music Corp. v. Foullon, 1949, 171 F.2d 905. The fact that mechanical reproduction is considered a separate area not under the general scope of the copyright law is also illustrated by the fact that the basic copyright texts deal with mechanical reproduction of music as a separate topic, and do not include it with their general discussion of copyright infringement. See e. g. Shafter, Musical Copyright (1932); Weil, Copyright Law (1917); Bowker, Copyright, Its History and Its Law (1912); Amdur, Copyright Law and Practice (1936).

◆Similarly, comment has often been made to the effect that a recording is not a copy within the meaning of the copyright law, and that distribution of such records is not publication. See Capitol Records v. Mercury Records Corp., 2 Cir., 1955, 221 F.2d 657, 659–662, 664–665; Nimmer, Copyright Publication, 56 Col.Law Rev. 185, 188 n. 34 (1956). The problem of mechanical reproduction of musical compositions is not specifically covered in the Universal Copyright Convention adopted in Geneva in 1952 by the Intergovernmental Copyright Conference sponsored by UNESCO. However, Article VI of that Convention defines publication as "the reproduction in tangible form of copies of a work from which it can be read or otherwise visually perceived." In Dubin, Copyright Aspects of Sound Recordings, 26 So.Calif. L.Rev. 139–156 (1953), it is pointed out that putting "aural" perception into this definition of a copy would have caused confusion in the United States where records are not deemed to be publications.[9]

Despite this background of comment adverse to the claims made herein by the publisher plaintiffs, and despite the fact that except for one lawsuit brought in 1952 [to be discussed *infra*], the musical industry has operated under the assumption that the $250 minimum penalty does not apply to mechanical reproduction, and that the sole remedies for such recording are against the manufacturer as set forth in Sections 1(e) and 101(e), the publishers urge here that the copyright law can be and should be construed in favor of their contentions. They base their argument on the language in Section 101(e) which speaks of "infringement of such copyright by the unauthorized *manufacture, use, or sale*" of recordings and other mechanical sound reproducing devices. (Italics supplied.) This subsection then states that the plaintiff is entitled to recover for such infringement and it does not specifically limit that right to recovery from the manufacturer. The publishers contend that there is a distinction between recordings made by a manufacturer who files notice of compulsory license but then fails to pay the royalties, and re-

---

9. This American view that recordings are not publications stems from the limited scope of the copyright law of 1909 and its rationale that records are not copies. This has caused confusion in another area of the musical industry; since a recording is not a copy of a musical selection, it cannot be filed under the copyright law which requires that a copy of the composition to be protected must be filed. With the current popularity of records as opposed to sheet music, a practice has arisen of releasing musical selections in recorded form before publishing the sheet music. The question arises, is such a recorded release a publication within the meaning of the copyright law which would deprive the composer of a right to later file a "copy" of his song and receive statutory protection. (Publication ends common law rights, and filing under the statute must be simultaneous with such publication, or there is a dedication to the public and all copyright protection is lost.) See Kaplan, Publication in Copyright Law: The Question of Phonograph Records, 103 U. of Pa.L.Rev. 469 (1954–55); Chafee, Reflections on the Law of Copyright, supra. This question would not have arisen were a recording considered a copy within the meaning of the copyright law.

cordings made by a manufacturer who does not even file notice. The former they agree are covered exclusively by the royalty-treble royalty provisions. They urge, however, that the latter are records whose manufacture is unauthorized within the meaning of Section 101(e) and whose use or sale is an infringement of the Act. They contend that Section 101(e) with its limited treble damage provisions is the sole provision applicable only in situations where there has been a compulsory license agreement. Where there is no such arrangement, as was the case here, then there is regular copyright infringement and the other infringement sections, notably the minimum damage section, 101(b), are applicable. Since Krug did not even file the requisite notice, it is urged that his recordings fall into this latter category. The plaintiffs argue that if Section 101(e) is construed as applying only to the initial manufacture of such records, and as providing recovery only against such an unauthorized manufacturer, then the phrase "manufacture, use or sale" becomes meaningless, and this, they say, would be improper construction.

Although their argument has surface merit, particularly the contention that an adverse ruling will deprive the phrase "manufacture, use, or sale" of any meaning, I find that plaintiffs' position cannot be sustained; for to uphold them here would be to discard the entire statutory royalty and treble royalty scheme so painstakingly worked out by Congress in its attempt to resolve conflicting interests. Further, such a ruling would create practical enforcement difficulties incapable of being handled by judicial decision.

Dealing with this latter problem first, it has been held that a manufacturer may, at any time, change his status from infringer to compulsory licensee by filing the requisite notice and paying the royalties due. In G. Ricordi & Co., Inc., v. Columbia Graphophone Co., 2 Cir., 1920, 263 F. 354, this change in status was permitted between judgment and

appeal in a suit involving illegal manufacture, and that case is still the controlling law. In this very action, Judge Dawson recognized the Ricordi principle when he ruled that the injunction against Krug would be lifted and his recording materials returned to him whenever he filed the requisite notice and paid the royalties due. Miller v. Goody, supra. Had there been no consent decree, and had Krug subsequently become a compulsory licensee, the records sold by defendants herein would have lost their status as infringing records. Indeed, by the terms of plaintiffs' own argument, had Krug filed notice and not paid the royalties, the records would still have lost infringing status at least to the extent that the only protection against them would then be that accorded under the mechanical reproduction sections and limited to recovery from the manufacturer. It is difficult to believe that Congress intended to hinge such huge differences in consequence on a paper distinction; moreover, Congress could hardly have intended to create a seller's liability totally dependent on the manufacturer's surface intent. It would be illogical to rule that a seller may at any time be sued as an infringer when he has no control over the status of the records involved. The copyright law must be read to have general application, and if it had been intended ever to apply to a non-manufacturing seller it would provide, as a matter of good drafting, for a set point in time when the seller does become liable, and set conditions for suit would be prescribed which would not rest wholly upon the actions of others. Clearly, the type of liability formula necessary is one which would have to be devised by the legislature, not imposed on an ad' hoc basis by the judiciary, and to impose liability against sellers generally without some such formula would be contrary to Congress' clear purpose to impose primary [if not sole] liability upon the manufacturer of infringing records.

Even more basic to the argument against plaintiffs' interpretation is that their construction makes the whole royal-

ty-treble royalty, limited recovery scheme meaningless. According to plaintiffs' construction, the proprietor may recover royalties and damages from the infringing manufacturer, and then minimum damages or actual damages from any distributors of the infringing records, no matter how innocent their intent. This is basically the protection accorded against copying under the copyright law; had this been intended, Congress would merely have called a recording a copy and simplified its problem, or it would have provided for compulsory licensing and then said that recording without a license would be penalized as is ordinary infringement. The additional punitive clauses in Sections 1(e) and 101(e) would have been unnecessary. This line of reasoning finds further support in the fact that the words "manufacture, use, or sale" appear in the same phrase; therefore, if the infringing seller is liable under Section 101(b), so also is the infringing manufacturer, and the penalty provisions of Section 101(e) either become meaningless or give to the musical copyright proprietor a greater choice in his type of recovery than is given to any other copyright holder. Such a conclusion would be wholly inconsistent with the legislative purpose of giving only limited rights against mechanical reproduction of music.

The basic unsoundness of plaintiffs' position is also demonstrated by the fact that for over forty years the musical industry operated on the assumption that the $250 minimum penalty clause was not applicable to mechanical reproduction of music. Perhaps a brief statement of the historical background of the industry may explain why the instant contention is now being pressed with such tenacity. The plaintiffs' present position is being pursued as part of a general campaign on the part of copyright proprietors, legitimate recording companies, and musicians' and performers' organizations to drive record pirates out of business. This drive received impetus when, with the advent of long-play records, the record pirates, who had hitherto confined their operations largely to old records not recently re-released by the major companies, began to dub recordings of current hits and to invade the entire record market on a large scale. In January of 1952, as part of that campaign, Columbia Record Company and Louis Armstrong joined in a suit against one of the major record pirates, Paradox Industries, Inc., and its president, Dante Bollentino. This company, which sold its records under the "Jolly Roger" label, had dubbed many recent recordings made by Armstrong for Columbia. The Columbia suit was based on unfair competition and on invasion of Armstrong's right of privacy. The litigation ended in a consent decree which enjoined the defendants from dubbing plaintiffs' records and ordered that records and masters of plaintiffs' items be delivered up for destruction. The defendants were also enjoined from using Armstrong's name and picture without permission, and Armstrong received $1,000 in damages.

Although the settlement seemingly produced a favorable reaction in that the record pirates started to run for cover, the music industry was not quite satisfied with the decree. See Note, Piracy on Records, supra. Part of their dissatisfaction might well have stemmed from the fact that the settlement decree still created no precedent in a legally foggy area, and it was thought by many that the strongest pressure could be brought to bear against the pirates via the Copyright Act. Accordingly, four music publishing houses brought suit against Paradox and Bollentino alleging infringement of various musical copyrights held by them in that the defendants had recorded the selections without filing notice or paying the copyright fees. The defendants were already out of operations as a result of the Columbia consent decree, and they both defaulted; their attorney wrote to plaintiffs' attorneys that any victory would be pyrrhic. The plaintiffs had sued under the theory pressed here, i. e. that they were entitled

to $250 per infringement.[10] Their brief in that case, which I have examined, nowhere indicated that there might be a difficult statutory interpretation problem as to whether the minimum penalty clause was applicable to recordings, and, there being no answering brief or argument, the default decree was entered as requested.[11] This default decree represented the sole occasion that the $250 minimum penalty had been applied to mechanical reproduction cases, and under the circumstances leading to its rendition, it cannot be considered as authority for plaintiffs' contentions as these contentions were never aired or contested. It must be emphasized that in the instant case, plaintiffs seeks to extend this penalty to non-manufacturing sellers, a group on which Congress did not impose any duties under the mechanical reproduction provisions.

I have reached my decision in this matter with reluctance, but the conclusion is one from which I cannot escape. The inequities and inadequacies of the present law cry out for correction. It is scant comfort to the publisher plaintiffs herein to be told that although their plight is distressing, there are others in the industry, notably recording companies and talented performers, who at present receive even less protection from record pirates and those who distribute their wares. It is equally harsh to tell them that their remedy lies in the legislatures when the problems of the recording industry have been before various legislative bodies over the years, and the conflicting interests involved have prevented any solution. But I cannot innovate at pleasure in the name of justice nor is it proper for me to roam at will in the face of legislative restraint in pursuit of what I consider to be the ideal. Where the legislative mandate is clear, as is the case here, judges are bound to follow the law scrupulously regardless of personal preference, and the rule of strict adherence to the statute is never so necessary as where the legislature has established what it considered to be

10. They sued for this minimum amount not only because of the difficulty of proving the number of illegal records made, but because one of the reasons the pirates often did not bother to qualify under the Copyright Act was their belief that the minimum penalty clause was not applicable to mechanical reproductions. Since the usual number of pressings of each bootlegged record was 750 to 1,000, this meant that at the statutory 2 cent royalty rate the proprietors would receive $15 or $20 recovery per infringement, and the treble damage provisions would not even bring the rate up to $100 per infringement. Note, Piracy on Records, supra. Even though the Copyright Act provides for recovery of costs and reasonable counsel fees in cases arising under the mechanical reproduction provisions, there are other expenses in time and effort beyond the allowable counsel fees which made it impracticable for copyright proprietors to bring suit for such a small sum, so the pirates scoffed at the law with impunity.

11. Actually four companion cases were brought by the different publishing companies involved, although only one brief was submitted for all. Default was entered in Robbins Music Corp. v. Paradox Industries, Inc. and Dante Bollentino, Civ. 75-18, Leo Feist, Inc. v. Same, Civ. 75-15, Mills Music, Inc. v. Same, Civ. 75-16, Shapiro, Bernstein & Co., Inc. v. Same, Civ. 75-17. All decrees were entered in the Southern District of New York, June 5, 1952, per E. A. Conger, D. J. The attorneys who represented the publishers in that litigation are acting in the same capacity in the present case. Their brief then, as here, cited many cases which have held that every copyright infringement entitles the proprietor to the $250 minimum penalty, that innocence of the infringer is no excuse, and that the copyright certificate is prima facie evidence that the selection involved is protected by that law. These cases are irrelevant though to the question of whether manufacture or sale of recordings of musical selections is to be considered infringement under the general terms of the statute or is to be treated as a separate problem. Although plaintiffs' attorneys ably argued and briefed that question in the present case, they were unable to present a single case or legal commentary favorable to their contention other than the four companion cases, supra, where default was entered, and this problem was never raised.

a comprehensive regulatory scheme as it did in the case of mechanical reproduction of music. For a judge to attempt to qualify or amplify the rights Congress delineated in such detail would be both imprudent and improper. In this regard, the words of Judge Learned Hand in RCA Mfg. Co. v. Whiteman, 2 Cir., 114 F.2d 86, 90, certiorari denied Whiteman v. RCA Mfg. Co., 1940, 311 U. S. 712, 61 S.Ct. 393, 85 L.Ed. 463, bear repetition.

> "We are adjured that courts must adjust themselves to new conditions, and that in the case at bar justice clearly points the way to some relief. We cannot agree; no doubt we should be jealous to execute all reasonable implications of established doctrines; but we should be equally jealous not to undertake the composition of substantial conflicts of interests, between which neither the common-law, nor the statute, has given any clue to its preference. We cannot know how Congress would solve this issue; we can guess—and our guess is that it would refuse relief as we are refusing it—but if our guess were the opposite, we should have no right to enforce it."

In the present case, the best that can be said for plaintiffs' position is that Congress has not considered this problem and the worst, that Congress has considered this problem and has decided against the plaintiffs' position. Under either interpretation of legislative history, the hands of the judiciary are tied. The plaintiffs' motion for summary judgment in the sum of $250 per infringement from each defendant must, therefore, be denied.

Defendants have cross-moved for summary judgment in their favor against the publisher plaintiffs dismissing their complaint. Since the publishers allege unfair trade practices and unfair competition as well as copyright infringement, it must be determined whether they may maintain such a cause of action here. The musical selections involved have been published; such publication was a dedication to the public and put an end to common law copyright protection. In the absence of the copyright law, therefore, all persons would be free to copy the compositions in question. This being so, in the absence of statute, it would not be unfair competition either to copy the compositions or to reproduce them in sound; any other conclusion would deprive the theory of dedication to the public of any meaning. Thus the copyright law becomes the sole measure of protection available to a composer of a published work, and this protection depends on the terms of the statute itself. See Nimmer, Copyright Publication, supra. That this rationale gives a record manufacturer the opportunity to profit from a composer's skill without paying therefor was pointed out clearly by Justice Holmes concurring in the Apollo case, supra, but the fact that the manufacturer is getting something for nothing does not make his actions illegal. And the same holds true with the distributor of his products. I find, therefore, that the copyright proprietors have no common law rights against the defendants which can be asserted here.[12]

Under these circumstances, the motion of the defendants must be granted, and the publisher plaintiffs' complaint must be dismissed. So ordered.

---

12. As pointed out in Note [6] infra, there is a distinction between the possible common law rights of performers and recording companies as to whom Congress has not legislated, and the rights of those who hold the copyrights on published musical compositions. So long as the publishers base their claims on injury to the copyrights they hold, their remedy must be sought under the statute.