**JONDORA MUSIC PUBLISHING COMPANY et al., Plaintiffs,**

v.

**MELODY RECORDINGS, INC., et al.,
Defendants.**

Civ. A. No. 1741–72.

United States District Court,
D. New Jersey.

Nov. 22, 1972.

Lum, Biunno & Tompkins by C. Stephen Barrett, III, Newark, N. J. (Abeles & Clark, New York City, of counsel), for plaintiffs.

Glauberman & Weiss by Sheldon A. Weiss, Jersey City, N. J., for defendants U. S. Tape Inc. and George Tucker.

MEMORANDUM OPINION

LACEY, District Judge:

Plaintiffs herein are music publishing companies which on their own behalf, and on behalf of the class they purport to represent (claimed to be 3500 music publishers), seek to permanently enjoin the unauthorized manufacture and sale of recordings serving to reproduce mechanically many of their copyrighted musical compositions. This practice is referred to in the trade as "bootlegging" or "pirating". Plaintiffs invoke jurisdiction under Section 1, *et seq.* of the Copyright Act (the Act), 17 U.S.C. § 1 *et seq.* In addition to an injunction against further infringement, damages for past infringement are sought. Defendants have not yet filed Answers to the Verified Complaint.

Simultaneously with filing of the complaint, verified October 18, 1972, by Al-

bert Berman, managing director of The Harry Fox Agency, Inc., alleged in the verification to be "authorized agent for the plaintiffs herein in the licensing of the rights of mechanical reproduction in their respective copyrighted musical works," plaintiffs applied *ex parte* for a writ of seizure. *See* 17 U.S.C. § 101(c)(d); Rules 3–13, Rules of Practice for Copyright Cases, as adopted by the United States Supreme Court (17 U.S.C. p. 276, et seq.). Said application was supported by the averments of the verified complaint, certain affidavits, and bonds. Impressed by the forceful and persuasive documentation thus submitted, I signed Orders on October 25, 1972, directing the clerk to issue writs of seizure for impounding materials owned by the various defendants which they were allegedly using to "bootleg" and "pirate" plaintiffs' copyrighted musical compositions. Execution on the issued writs commenced the same day.

The matter immediately before me relates to the defendant U. S. Tape, Inc. Having heard through industry circles of the aforesaid writs having been issued, it, through its president, George Tucker, communicated with its counsel, Sheldon Weiss, Esq., who thereafter appeared before me, with plaintiffs' counsel, on October 26, 1972, on an application to stay execution of the seizure writ. I entered an order staying execution, based upon U. S. Tape's entering into an injunction which effectively enjoins it from manufacturing or selling its products. At the same time, I set down for argument U. S. Tape's application to quash the writ of seizure and to vacate the aforesaid injunction. Argument was heard on November 9, 1972. Additionally, I have had the benefit of review of answering affidavits from Mr. Tucker, David Jensen, and Niki Giatros, a reply Affidavit from Frank Comerci, and briefs.

## THE FACTS

The plaintiffs' documentation in support of their application for a writ of seizure against U. S. Tape, Inc. comprised the Berman-verified Complaint and the Berman and Tempesta affidavits. They persuaded me—and I confess I believed what they asserted—that U. S. Tape, in addition to being a "bootlegger" or "pirate" (plaintiffs' characterizations) or a duplicator (defendants' characterization), had used plaintiffs' copyrighted musical compositions without paying royalties; operated furtively to avoid detection; used a "phony" name; utilized a post office box instead of an office; hired a telephone answering service, again, to avoid detection; that when its "operation had been uncovered," it had "promptly abandon[ed] . . . [its] currently occupied premises and continue[d] operations in another clandestine location. . . ." I was told, for example, that a "typical bootleg . . . operation can be moved completely within a matter of hours . . . [and] once a duplicating plant has been pinpointed, it is essential that the means for making the infringing recordings be seized in order to preclude transfer thereof to another secret location." I was told too that at the premises of U. S. Tape, Inc. there was nothing to identify it as their place of business. Further I was advised that this defendant was conspiring with others "to deprive the Class Plaintiffs of rights in . . . [their] copyrighted musical compositions," that it had joined in a "syndicate" with others, that it had only "feigned compliance" with the Copyright laws by "indiscriminate and erroneous notices of intention . . ." with checks in "trifling amounts" in purported payment of royalties, was guilty of "sham and a pretense," and had no intention of "furnishing reports, and making full payment of royalties."

I was not told that on June 20, 1972, defendant's counsel had written to plaintiffs' counsel taking a forthright stand as to non-liability, that numerous notices of intention had been filed and served by the defendant, and that $4,000 to $6,000 a month of royalties was being paid by the defendant to plaintiffs and other music publishers. Nor was I told

that some of the publishers had accepted the royalty payments while others had, through the Fox organization, returned defendant's checks. These material facts were not conveyed to me. Moreover, it was soon to develop, false affirmative statements were embodied in the affidavits and verified complaint tendered to me *ex parte* for the drastic remedy of seizure.

This is revealed in the deposition taken of Mr. Berman on November 2, 1972, by counsel for U. S. Tape, Inc. I shall not deal with the deposition in detail. I shall simply say that it demonstrates clearly and completely that the deponent, Mr. Berman, advanced, as to U. S. Tape, Inc., shocking misstatements in his verified complaint and affidavit which I had relied on as being true and credible in issuing the aforesaid writ as to this defendant.

As if this were not enough, U. S. Tape, Inc. having submitted substantial answering affidavits denying the aforesaid charges made by plaintiffs (except for the admission of copying), plaintiffs reply by affidavit only to the extent of claiming that seizure and physically moving of defendant's equipment would not create serious hardship and expense.

I therefore adopt the following, taken from defendant's brief, as an accurate statement of the factual posture of the case at this time, and make congruent findings of fact (Brief of U. S. Tape, at 2–6):

The operative facts are fully set forth in defendant's affidavits, and need not be repeated at length in this memorandum. We do wish, however, to refer to some of the allegations of the "verified" complaint which are palpably untrue, as applied to the activities of U. S. Tape.

The complaint alleged (¶¶ 16 and 18) that the defendants named therein "have entered into a plan and conspiracy to deprive plaintiffs of rights in copyrighted musical compositions . . ."; have "organized a syndicate in New Jersey to engage exclu-

sively in the manufacture and sale of bootleg recordings in the form of tape cartridges . . ."; and that "in the manufacture and sale of such bootleg tape cartridges, legitimate recordings, names of recording artists and copyrighted musical compositions are used without authorization, license or consent and without compensation therefor . . .". In addition, plaintiffs charged (¶¶ 19) that the defendants established a highly "clandestine" operation for the manufacture of said tape cartridges, used "post office boxes and defendant American Copyright Research, Inc., for the purpose of concealing their locations from [The Harry Fox] Agency", and used other means designed to "camouflage their operation and avoid exposure."

The foregoing allegations are utterly false as applied to U. S. Tape. See, *e.g.*, Tucker affidavit, ¶¶ 22 to 26. Nor, we might add, did the plaintiffs have any reasonable grounds to make such charges against this defendant in the first place, as is abundantly clear from Mr. Berman's admissions on depositions. See *e.g.*, pp. 6, 15–16, 23, 31 to 33, 39 to 44, and 97 to 99.

As to Mr. Berman's affidavit, on depositions he admitted that in most respects, his description of the typical, so-called "bootleg" operation either did not apply to U. S. Tape, or that he had no knowledge of whether it did or not. As to the statement in ¶ 3, that the "bootleggers make no royalty payments", and therefore the music publishers receive "no return" for the use of their compositions, he admittedly was in no position to deny U. S. Tape's assertion that it has paid royalties in the full statutory amount, in which case the plaintiffs-publishers would have received the same royalties they receive from other record manufacturers. (pp. 60 to 63; 67–68 and 80). As to ¶ 5 of his affidavit, Mr. Berman could point to no moneys or effort expended by The Harry Fox Agency to "search out" U. S. Tape's

location—the Agency did not even "invest" in a phone call to either of the numbers listed on U. S. Tape's notices of intention. (81–22 to 82–14); nor could he point to any steps taken by U. S. Tape to conceal its location or the identity of its principal. He admitted that to his knowledge, U. S. Tape has never used a coined or fictitious name, a post office box or telephone answer services (85–21 to 86–6; 39–13 to 44–1).

As to his assertion (¶ 5) that the "typical" duplicating operation can be moved completely within a matter of hours with the aid of an electrician able to disconnect the equipment and a moving van," Mr. Berman had never seen U. S. Tape's operation, has no expertise in the technical end of sound recording duplication, and knew "nothing" about the sensitivity of U. S. Tape's equipment (86–3 to 87–7). As to Mr. Tempesta's affidavit, even if taken at face value (but see Mr. Tucker's affidavit, ¶¶ 29 and 30), it merely demonstrates that the Fox Agency had no difficulty in locating (or "penetrating") U. S. Tape's premises.

In short, the complaint and affidavits filed by plaintiffs, which depicted U. S. Tape as a "bootlegger" operating clandestinely and ready to go "underground" at a moment's notice upon "discovery" of its operation, not only have been exposed as sham, but as having been made by someone, on plaintiffs' behalf, who lacked any reasonable basis to believe they were true in the first place.*

* Mr. Berman's sources of information and belief, according to his verification, consisted of "copyright documents, recordings and memoranda of plaintiffs' counsel [Abeles & Clark, Esqs.], all of which are in the possession of plaintiffs' counsel." However, Mr. Berman's deposition revealed: (pp. 6 to 13) (a) the "copyright documents" referred only to the musical composition copyrights listed in the Schedules annexed to the complaint; (b) "recordings" referred only to the tapes manufactured by U. S. Tape, and (c) there were *no* written memoranda of plaintiffs' counsel which in any way referred to the activities of U. S. Tape. Moreover, Mr. Clark's "file" on U. S. Tape included a copy of our letter, as attorneys for U. S. Tape, to Abeles & Clark, dated June 20, 1972 (Exhibit "B" annexed to the Tucker affidavit), and notices of intention to use, all of which were signed by Mr. Tucker, as president, and bore U. S. Tape's address and telephone numbers, none of which are fictitious. Those documents hardly were consistent with plaintiffs' assertion that U. S. Tape was trying to conceal either its identity, location, or the nature of its business.

Plaintiffs also asserted in the complaint (¶ 19), that the defendants, including U. S. Tape, "feigned" compliance with the compulsory license provisions of the Act by mailing "indiscriminate and erroneous" notices of intention, and by sending royalty checks in "trifling" amounts (¶ 20(b)), and thus defendants' "purported" compliance with the compulsory license provision "was not in good faith, but rather a sham and a pretense" (¶ 21). Miss Giatras' affidavit, however, established that U. S. Tape has in fact complied with the cumbersome procedures of the compulsory license provisions of the Act, by: (a) filing proper notices of intention to use prior to the manufacture thereof, 17 U.S.C. § 101(e); and (b) making monthly reports and royalty payments to the plaintiffs at the statutory rate, 17 U.S.C. § 1(e). And Mr. Berman admitted on depositions that he knew of no case in which U. S. Tape mailed "indiscriminate or erroneous" notices of intention (51–2 to 8); nor was he suggesting that U. S. Tape did not pay royalties at the statutory rate (61–17 to 21). Thus, U. S. Tape's compliance with the compulsory license provisions cannot conceivably be characterized as a "sham and a pretense"; but those epithets do accurately describe the allegations of the complaint.

## THE LAW

Plaintiffs' counsel has argued that, even with the facts as I now perceive them to be, their clients are entitled, as a matter of law, to a writ of seizure against the defendant. I must disagree.

By their misstatements plaintiffs practiced a fraud on this Court on their *ex parte* application. Accordingly I shall enter an order forthwith vacating the writ of seizure and dissolving the injunction.

As was stated by the United States Supreme Court in Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, at 814–15, 65 S.Ct. 993, at 997–98, 89 L.Ed. 1381:

> The guiding doctrine in this case is the equitable maxim that "he who comes into equity must come with clean hands." This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be "the abettor of iniquity." Bein v. Heath, 6 How. (47 U:S.) 228, 247 [, 12 L.Ed. 416]. Thus while "equity does not demand that all suitors shall have led blameless lives," Loughran v. Loughran, 292 U.S. 216, 229, [54 S.Ct. 684, 78 L.Ed. 1219], as to other matters, it does require that they shall have acted fairly and without fraud or deceit as to the controversy in issue. Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 245, [54 S.Ct. 146, 78 L.Ed. 293]; Johnson v. Yellow Cab Co., 321 U.S. 383, 387, [64 S.Ct. 622, 88 L.Ed. 814]; 2 Pomeroy, Equity Jurisprudence (5th Ed.) §§ 379–399.

This maxim necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant. It is "not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." Keystone Driller Co. v. General Excavator Co., supra, [290 U.S.] 245, 246 [, 64 S.Ct. 622]. Accordingly one's misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character. Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim by the chancellor.

In all fairness, it should be stated that local counsel is not blameworthy. He accepted, as I did, the Berman submissions at face value. The fault lies with New York City counsel herein who are apparently also general counsel for many of the plaintiffs and The Harry Fox Agency. The facts presented lead me to assume that that firm determined, without analysis, to transport into this case, without distinction as to any defendants, the same kind of biting allegations made by their clients against record duplicators in other suits heretofore instituted in great numbers throughout the United States. Notwithstanding the bitterness with which plaintiffs and said general counsel regard defendants' activities, counsel should have sifted meticulously as to all defendants each of the sworn averments presented to me *ex parte* to obtain the extraordinary seizure relief. By failing to do so they violated that confidence which a tribunal must place in counsel.

I am vacating the writ of seizure on another ground as well. For the reasons hereinafter set forth, and with all deference, I believe that Duchess Music Corporation v. Stern, 458 F.2d 1305 (9th Cir. 1972), reh. and request for rehearing en banc denied, cert. denied, 409 U.S. 847, 93 S.Ct. 52, 34 L.Ed.2d 88 (1972), relied upon by plaintiffs, does not correctly state the law.

For an understanding of the music publishing and recording industry, and the issues herein, there is to be distinguished a musical composition (the words and music of a song or tune) on the one hand, and the musical performance of that composition by recording artists, on the other. Also, the musical composition and the performance thereof must be differentiated from the physical objects, such as the records and tapes, on which the performance is mechanically reproduced. The legal issue in this case can then be stated: did Congress by the Copyright Act of 1909 grant to musical composition copyright holders the power to prevent third persons from copying a particular performance of that composition, where (a) with the copyright holder's permission, the performance has already been fixed on a physical object capable of reproducing it, and (b) the third person has complied with the compulsory license provisions of the Act by filing and serving notices of intention and paying royalties to the copyright holders?

The Constitution provides that Congress has the power to grant and regulate copyrights:

The Congress shall have Power . . . To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries. U.S.Const., Art. I, § 8, cl. 8.

Title 17 of the United States Code embodies the statutory fabric known as the Copyright law.

Construction is required of the remedial and compulsory licensing provisions of the Copyright Act of 1909, 17 U.S.C. §§ 1(e) and 101(c), (d) and (e), relating as they do to copyright protection for musical compositions and its application to sound recordings.

We start with the Act insofar as it gave protection to composers against mechanical reproduction of their music. As it stated in *Duchess,* while giving the composer the exclusive right to prohibit the use of his music "by the mechanical reproducers," it also provided that if he permitted mechanical reproduction, then, upon the payment of a reasonable royalty, all who desired might "reproduce the music." 458 F.2d at 1309, quoting from H.R.Rep. 6 (1909).

Congress thus passed § 1(e) of the Copyright Act, 17 U.S.C. § 1 et seq., which in pertinent part reads:

*Provided* . . . as a condition of extending the copyright control to such mechanical reproductions, that whenever the owner of a musical copyright has used or permitted or knowingly acquiesced in the use of the copyrighted work upon the parts of instruments serving to reproduce mechanically the musical work, any other person may make similar use of the copyrighted work upon the payment to the copyright proprietor of a royalty of 2 cents on each such part manufactured, to be paid by the manufacturer thereof. . . .

Section 101(e) of the Copyright Act, 17 U.S.C. § 101(e), provides in pertinent part:

*Interchangeable parts for use in mechanical music-producing machines.—* Interchangeable parts, such as discs or tapes for use in mechanical music-producing machines adapted to reproduce copyrighted musical works, shall be considered copies of the copyrighted musical works which they serve to reproduce mechanically for the purposes of this section 101 and sections 106 and 109 of this title, and the unauthorized manufacture, use, or sale of such interchangeable parts shall constitute an infringement of the copyrighted work rendering the infringer liable in accordance with all provisions of this title dealing with infringements of copyright and, in a case of willful infringement for profit, to criminal prosecution pursuant to section 104 of this title.

To repeat then, § 1(e) of the Copyright Act provides in pertinent part that after the owner of the copyright in a

musical work has authorized its use in the manufacture of parts of instruments ". . . any other person may make a similar use. . . ." This is the so-called "compulsory license" provision. It is upon this that defendant relies. It claims that it has taken advantage of it, has filed the requisite notices of intention, and made (or tendered) the requisite royalty payments, all of which I must credit in view of the record. Plaintiffs on the other hand contend that the "compulsory license" provision is not available to a duplicator of the recordings of the licensees of the copyright proprietor. Thus, plaintiffs' counsel herein, having represented the plaintiff-appellant in *Duchess*, states that the question of law as framed therein for the Court of Appeals was as follows (Plaintiffs' Reply Brief herein, at 3):

> The compulsory license provision of the Copyright Act (17 U.S.C. § 1(e) . . .) which applies to certain recordings of a copyrighted musical work, provides that after the copyright owner has authorized the first use of the copyrighted musical work in making such recording, ". . . any other person may make a similar use of the copyrighted work . . ." upon specified conditions.
>
> Does the right to make a "similar use" permit duplication of the recordings of the copyrighted musical work made by another under a prior license, or is it restricted to making new recordings of the copyrighted musical work?

The *Duchess* court stated (458 F.2d at 1310–11):

> The statute provides that anyone who properly invokes the license provision "may make *similar use* of the copyrighted work." (emphasis supplied.) Rosner admits that she duplicates appellants' copyrighted compositions. She does not make "similar use" of them, she makes exact and identical copies of them. This is clearly outside the scope of the compulsory license scheme.

> . . . . Rosner may, of course, record appellants' songs, when she hires musicians, artists, and technicians. Instead, she steals the genius and talent of others. She deceives others into thinking that her tapes represent her own work. She has no "right to copy." *See* Capitol Records, Inc. v. Greatest Records, Inc., 43 Misc.2d 878, 252 N.Y.S.2d 553 (S.Ct., 1964). She may not continue her piracy under the flag of compulsory licensing.

The *Duchess* court relied upon Aeolian Co. v. Royal Music Roll Co., 196 F. 926 (W.D.N.Y.1912), which, at 927, had stated:

> The provision of the statute (section 1(e) that "any other person may make similar use of the copyrighted work" becomes automatically operative by the grant of the license; *but the subsequent user does not thereby secure the right to copy the perforated rolls or records. He cannot avail himself of the skill and labor of the original manufacturer* of the perforated roll or record by copying or duplicating the same, but must resort to the copyrighted composition or sheet music, and not pirate the work of a competitor who has made an original perforated roll.

Accordingly, to afford the licensee a remedy against piracy of this kind the court concluded that not only the copyright owner, but its licensee, alone, could invoke the general injunction provision of the Act against such practice.

I think *Aeolian* was wrongly decided as I think *Duchess* was wrongly decided.

I can do no better in analyzing *Aeolian* than did the District Judge in *Duchess* (who was reversed by the Court of Appeals):

> Although Aeolian has never been expressly overruled, it has been meagerly cited and severely criticized. First of all, sections 1(e) and 101(e) dictate that there be no exclusive licensee of the rights of mechanical reproduction. The Aeolian decision which would nev-

ertheless allow a licensee to seek an' injunction on such grounds is fundamentally incompatible with the above-mentioned compulsory license principle. Furthermore, "[i]f the [Aeolian] court's reasoning is right, the practical effect would be to give the licensee a copyright in his record." Note, Piracy on Records, 5 Stan.L. Rev. 433, 445 (1953), something Congress has not seen fit to do. E.g., Capitol Records, Inc. v. Mercury Records Corp., 221 F.2d 657, 105 USPQ 163 (2d Cir. 1955).

Nevertheless, plaintiffs would argue that Aeolian's rationale condemning the practice of a subsequent manufacturer appropriating the labor and skills of a competitor by duplicating the latter's product is significantly similar to and compatible with certain common law rules of unfair competition which would prohibit such duplicating or pirating. By this approach they would have the Court infer that the manufacturing defendants are not entitled to avail themselves of the compulsory license feature of the Act. But this point only serves to illustrate another woeful inadequacy of the present copyright legislation. Copyright plaintiffs seek injunctive relief exclusively under the Act and not under any theory of unfair competition or unfair trade practice and, under the Act, Congress has not differentiated between a subsequent manufacturer who imitates another manufacturer's product and one who merely duplicates or appropriates the product with little or no investment of skill, talent or money.

In Miller v. Goody, 139 F.Supp. 176, 108 USPQ 409 (S.D.N.Y.1956), rev'd on other grounds sub nom. Shapiro Bernstein & Co. v. Goody, 248 F.2d 260, 115 USPQ 36 (2d Cir. 1957), the court at 177, 108 USPQ at 411, expressly recognized the bootlegger's or pirate's right to avail himself of the compulsory license provision of the Act:

Krug was entitled to manufacture recordings of these selections provided he filed notice of his intention to do so, and provided he paid the copyright proprietors a royalty of 2 cents for each record manufactured.

One commentator, in scrutinizing the implications of the above-quoted passage, has succinctly described the dilemma posed—a dilemma which cannot be circumvented by relying on the Aeolian decision, as plaintiffs have attempted to do:

The language of the Copyright Act would seem to include Krug, the pirate, as a member of that class of subsequent manufacturers favored by the lenient compulsory licensing provisions. But to follow the * * * court in actually regarding him as such results in the hopeless paradox of granting statutory privileges vis-a-vis the copyright holder at the same time that the dictates of common sense and common law demand penalty vis-a-vis the performer and the recorder. 13 Rut.L.Rev. 365, 367 (1958).

Stated otherwise, it would appear to be inconsistent in the least to allow plaintiffs to allege infringement under the Act and then on the other hand, selectively deny its applicability to defendants.

As to *Miller*, referred to in the above quotation, it appears that the defendant therein, Krug, taped some of Glenn Miller's recorded wartime radio broadcasts, and from these tapes manufactured his own records, which he sold to defendant Goody, a record retailer. Each of the songs had previously been recorded by Glenn Miller and hence the "compulsory license" provisions of the Act applied with respect to the musical composition copyrights. However, Krug never attempted to comply therewith. Nonetheless Judge Kaufman held that, had he paid the 2¢ royalty, he could have manufactured the recordings. The Court of Appeals for the Second Circuit did not disapprove the above-quoted language,

although it did reverse on the question of whether Goody, the retailer, was liable for the statutory royalties. *See* 248 F.2d at 261.

█ It is my view that the *Duchess* opinion in the Court of Appeals erroneously interprets the "compulsory license" provision of the Copyright Act. Simply stated, that court believed that because a musical composition is copyrighted, the unauthorized reproduction of the performance embodied in the sound recording of that composition is, and ought to be, prohibited by federal copyright laws. But that clearly was not the law when *Duchess* was decided. Neither performance nor recording was copyrightable. It might have been unethical, or, in some states, because there was a felt necessity for statutory intervention, a crime to "steal" a recording of a performance and thereafter sell it as your own. But clearly the licensee-manufacturer had no claim under the Copyright Act. Capitol Records, Inc. v. Mercury Records Corp., 221 F.2d 657 (2d Cir. 1955); Nimmer on Copyright, at 431–32 (1972 ed.). Regulation § 202.8(b) of the Copyright Office (37 C.F.R., Ch. II, Part 202.8) provided:

A phonograph record or other sound recording is not considered a "copy" of the composition recorded on it, and is not acceptable for copyright registration. Likewise, the Copyright Office does not register claims to exclusive rights in mechanical recordings themselves, or in the performance they reproduce.

Both sides herein have cited commentators in support of their respective positions. I think defendant has the better of it in this respect.

Defendant cites *Nimmer,* as follows:

As stated in *Nimmer, supra,* § 108.3, at 420–21:

All of the other rights granted to the copyright owner are exclusive with him. This is also true of the right to record as it relates to non-dramatic literary works and to dramatic works. The situation is more complicated, however, with respect to the right to record as it relates to musical compositions. The Congress which enacted the present Copyright Act was concerned with the possible emergence of "a great music monopoly." In order to avoid such an eventuality it was provided that the right to record musical compositions is an exclusive right only if and to the extent the copyright owner does not permit any recording to be made of the work. Once such a recording has been authorized, thereafter the right to record becomes non-exclusive, subject to the terms and conditions of the compulsory license provision of Sec. 1(e).

Thus, with respect to the duplication or re-recording of previously authorized recordings of copyrighted musical compositions, Professor Nimmer states (§ 108.4621, at 431–32):

Assuming such a record pirate duly serves a notice of intent to use, and pays the compulsory license royalties, the somewhat astounding result is that as to those sound recordings fixed prior to February 15, 1972, he is not an infringer under the Copyright Act. The only portion of that which he has recorded which is protectible under the Copyright Act, with respect to sound recordings fixed prior to February 15, 1972, is the musical composition itself, and that he is authorized to use for recording purposes upon payment of the statutory royalties. All of the other elements contained in the original record which he has without authority duplicated are not copyrightable, and hence his use of such other elements does not give rise to an action for copyright infringement.

Parenthetically, I shall deal shortly with the February 15, 1972 amendments (Public Law 92–140).

As Professor Nimmer states, to take a contrary view would "in effect recognize

a right of copyright in a recording without statutory justification and contrary to the expressed legislative intent." Id. at 433. Nimmer therefore concluded: "Despite a dearth of authority expressly holding that record piracy (assuming payment of statutory royalties) is not a copyright infringement, this conclusion seems inescapable for the reasons above indicated." (Id.)

For a penetrating analysis of *Duchess*, see International Tape Mfrs. Ass'n v. Gerstein, 344 F.Supp. 38, 52–53 (S.D. Fla.1972), (District Judge Layton, sitting by assignment). This case, it is noted, is on appeal to the Fifth Circuit.

Plaintiffs argue it would be inconceivable to afford duplicators the benefit of the "compulsory license" provision and thereby allow a duplicator to do that which is a crime, or unfair competition, under state law. Their argument carries them too far. It is precisely because licensee-manufacturers had no relief under the Copyright Law where the copyright holder accepted the "compulsory license" royalties that the national recording companies got state legislation on the books. *See International Tape Mfrs. Ass'n., supra,* as to the validity of such legislation. Of course, the existence of relief by way of unfair competition

does not call for an interpretation of the Copyright Act that effectively gives the aggrieved licensee-manufacturer statutory relief where it does not exist.[1]

Both sides also refer to industry understanding of the law. Again, defendant has the better of it. *See* Exh. A to Tucker affidavit, indicating the distinction drawn in the music industry between "legal" duplicators, who operated "openly and legally under the 1908 Copyright Law", and the "out and out pirates, counterfeiters and bootleggers [who] operate sub rosa, pay no royalties for the copyrighted music and flood the country with cheap tape copies of hit records."

We turn now to a consideration of P. L. 92–140, the Sound Recording Amendment of 1971. About the same time that the defendants in *Duchess* were attempting to take advantage of the loopholes in the Copyright Act, the music industry was obviously pressing Congress to close the gaps. On April 20, 1971, S. 646, the bill which eventually became P. L. 92–140, was passed in the Senate and sent on to the House. The legislative history of S. 646 clearly demonstrates that Congress likewise distinguished between "legal duplicators" and "bootleggers".[2]

---

1. *See International Tape Mfrs. Assn., supra* at 47–48
   Prior to the enactment of 92–140, the authorities held that sound recordings were not copyrightable; thus, the owner of a master disc could not look to the federal copyright laws for protection against the making of copies from a copy of the master disc.
   As a result, master disc owners turned to the several states to obtain protection, seeking refuge in the laws of unfair competition. [footnotes omitted]

2. Judge Layton in *International Tape Mfrs. Assn., supra,* refers to International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918); Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L. Ed.2d 661 (1964); Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964), and states (344 F.Supp. at 49–50):

Although both *Sears* and *Compco* were suits involving invalid patents, the language of *Compco* specifically includes copyrights within the scope of its decision limiting the sweep of state unfair competition laws. The interrelationship between *International News Service* on one hand, and *Sears* and *Compco*, on the other, is of crucial importance in understanding the legislative intent behind the enactment of Public Law 92–140. Because sound recordings as such were not afforded federal copyright protection, and since *Sears* and *Compco* seemed to undercut *International News Service* by prohibiting states from providing effective civil or criminal remedies to sound recording owners, Congress chose to place sound recordings within the ambit of protection provided by the federal copyright laws:
   "The purpose of [the bill] is twofold. First, Section 1 of the bill creates a

Both the Senate and House Reports on S. 646 state that under then existing law:

> If the unauthorized producers pay the statutory mechanical royalty required by the Copyright Act for the use of copyrighted music, there is no Federal remedy currently available to combat the unauthorized reproduction of the recording . . .
>
> \* \* \*
>
> The enactment of S. 646 will mark the first recognition in American copyright law of sound recordings as copyrightable works." S.R. 92–72, p. 4; H.R. 92–487, pp. 2 and 5. U.S.Code Cong. & Admin.News, 1971, p. 1567.

The House Report also states that any persons who "satisfy the claim of the owner of the musical copyright . . ." (i.e., by filing the appropriate notice of intention to use and paying the statutory royalty) "can and do engage in widespread unauthorized reproduction of phonograph records and tapes without violating Federal copyright law". H.R. 92–487, p. 2.

That defendant U. S. Tape's activities in no way infringe upon plaintiffs' musical composition copyrights is further demonstrated by the nature of the remedy chosen by Congress to deal with tape and record duplication. As stated above, the musical compositions, which are generally owned by publishing companies, must be distinguished from the performances of the compositions on a sound recording, which are arranged and paid for by the record companies. Since any record manufacturer is free to use the composition (once the copyright proprietor has permitted any record to be made of his song), and since duplicators should pay the creators of the composition at least the same royalty that the record companies pay, the copyright proprietor suffers no pecuniary loss from duplication, as long as the statutory royalties are paid by the duplicator. (Parenthetically, it is noted that many duplicators were operating outside the law, and were not paying the statutory royalties to the copyright proprietor). On the other hand, the duplicators' activities did reduce the profits of the record companies (and the performing musicians as well, if this were being paid by the record company on a royalty basis). But neither the record companies nor the performers had any copyrights in the recordings.

To remedy the situation, Congress, in § 1 of Public Law 92–140, created a limited copyright in sound recordings of performances of musical compositions.[3]

---

limited copyright in sound recordings, as such, making unlawful the unauthorized reproduction and sale of copyrighted sound recordings. \* \* \* [T]his right is applicable only to sound recordings fixed, published, and copyrighted on or after the effective date of the legislation and before January 1, 1975. Second, Section 2 of the bill provides that persons engaging in the unauthorized use of copyrighted musical works in recordings shall be subject to all the provisions of title 17 dealing with infringement of copyrights and, in the case of willful infringement for profit, to criminal prosecution pursuant to Section 104. U.S.Code Cong. & Admin.News, p. 1567." [Citing House Report No. 92–487.]

3. More specifically, Section 1 of P.L. 92–140 did the following: (a) amended 17 U.S.C. § 5 by adding "sound recordings" to the classes of "works" to which a copyright may be registered (now 17 U.S.C. § 5(n)); (b) defined "sound recordings" as "works that result from the fixation of a series of musical, spoken, or other sounds . . .", and defined "reproductions of sound recordings" as "the material objects in which sounds . . . are fixed by any method now known or later developed, and from which the sounds can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device, [and specifically including 'disks or tapes for use in mechanical music-producing machines'] " (now 17 U.S.C. § 26(e); and (c) amended 17 U.S.C. § 1 by adding a subsection (f), which provided that the copyright owner shall have the exclusive right to reproduce and distribute to the public . . . "reproductions of the copyrighted work if it be a sound recording".

However, Congress also provided in § 3 of the Amendment that:

> The provisions of title 17, United States Code, as amended by section 1 of this Act, shall apply only to sound recordings fixed, published, and copyrighted on and after the effective date of this Act [*i.e.*, February 15, 1972] and before January 1, 1975, and nothing in title 17, United States Code, as amended by section 1 of this Act, shall be applied retroactively or be construed as affecting in any way any rights with respect to sound recordings fixed before the effective date of this Act.

Thus, the record companies, which theretofore had no federal copyright protection for their recordings, or for the musical performances they served to reproduce, were afforded a sound recording copyright. But such protection was given only prospectively—it applies only to sound recordings that were "fixed (i.e., first recorded), published, and copyrighted" after February 15, 1972.

It is noteworthy that, while the "compulsory licensing" provisions remain for the musical composition copyright, the copyright protection for sound recordings did not include, as granted by the Amendment, a provision for "compulsory licensing." As to this, a three-judge court has said, in Shaab v. Kleindienst, 345 F.Supp. 589 (D.D.C.1972), at 590:

> Technical advances, unknown and unanticipated in the time of our founding fathers, are the basis for the sound recording industry. The copyright clause of the Constitution must be interpreted broadly to provide protection for this method of fixing creative works in tangible form.

> Sound recording firms provide the equipment and organize the diverse talents of arrangers, performers and technicians. These activities satisfy the requirements of authorship found in the copyright clause, which point has been conceded by the plaintiff at oral argument.

The 1909 revision of the copyright clause contains a compulsory licensing provision with respect to copyrighted musical compositions. There is no such provision in 92–140. The Court finds this distinction between the two provisions is rational and reasonable. The provision for compulsory licensing of copyrighted musical compositions promotes the arts by permitting numerous artistic interpretations of a single written composition.

If Congress in 92–140 had extended the compulsory licensing provisions to call for licensing of companies that wish to make and sell identical versions of the recorded compositions, these public benefits would not result. Consumer choices would not be broadened since identical interpretations would be supplied first by the originator and later by the licensee. Equally important, competition and the creative aspects of the industry would be impaired since established recording firms would be discouraged from investing in·new arrangements and performers, if they were compelled to license their successful interpretations to those desiring to take advantage of the originator's initiative and to add nothing themselves.

The purpose of Public Law 92–140 is to provide a limited copyright in sound recordings to protect against unauthorized duplication and "piracy". The specific language in the bill is designed to carry out that purpose. Accordingly, the argument that the legislation is ambiguous is without merit.

Again, the music publishers, on the other hand, neither sought nor obtained any enlargement of the scope of their non-exclusive musical composition copyrights. No changes were made in the language of the compulsory license provisions in 17 U.S.C. § 1(e) or in the "notice of intention to use" requirement of 17 U.S.C. § 101(e). Thus, with respect to the records and tapes which were not "fixed" after February 15, 1972, any person could still engage in

record and tape duplication "without violating Federal Copyright law," provided he complied with the compulsory license provisions of the Act.

However, Congress did give the music publishers a more effective weapon to deal with the illegal duplicators who did not pay royalty. Section 2 of P.L. 92–140, which unlike § 1 was effective immediately, amended 17 U.S.C. § 101(e) so as to subject those who did not comply with the compulsory license provision of the Act to civil liability "in accordance with all provisions of this title dealing with infringements of copyright and, in the case of a willful infringement for profit, to criminal prosecution pursuant to [17 U.S.C.] § 104."[4]

Thus, the legislative history of P.L. 92–140, and the precise remedies chosen by Congress to deal with the subject, manifest an expressed intent by Congress to permit such tape and record duplication to continue under the compulsory licensing provisions of the Copyright law, with respect to all sound recordings "fixed" prior to February 15, 1972.

I also find persuasive defendant's argument that if Congress had intended to make duplicators liable after October 15, 1971, for infringement of musical composition copyrights, regardless of whether the duplicator complied with the compulsory license provision, Congress could have simply amended § 1(e) by excluding from the benefits thereof those making an "exact" or "identical" copy of a pre-existing recording. Thus, if Congress had desired to make all duplicators immediately liable for infringement of musical composition copyrights, it easily could have done so by restricting the compulsory license privilege in some fashion. Instead, Congress created a new copyright in the sound recordings of performances of copyrighted musical works, effective, however, only with respect to performances on recordings that were "fixed, published and copyrighted" four months after the effective date of the 1971 Amendment.

Plaintiffs, of course, do not and cannot invoke herein this newly-created "sound recording" copyright, because (a) the records which defendant duplicates all were "fixed" (first recorded) prior to February 15, 1972 and (b) the plaintiffs-publishers would not, in any event, own the copyrights to the post-February 15, 1972 sound recordings. Rather those rights will inure to the benefit of the record companies, which hire the musicians, artists and technicians involved in creating the musical performances.

Accordingly, and for the reasons hereinabove set forth, defendant's motions are granted.

An appropriate order should be settled by counsel within five days.

---

4. Prior thereto, § 101(e) expressly precluded any criminal sanctions, and limited the liability of illegal duplications to civil damages not to exceed three times the statutory royalty, and injunctive relief.