**JONDORA MUSIC PUBLISHING COMPANY et al., Plaintiffs,**

v.

**MELODY RECORDINGS, INC., et al., Defendants.**

Civ. A. No. 1741–72.

United States District Court,
D. New Jersey.

June 28, 1973.

---

Abeles, Clark & Osterberg, New York City, Lum, Biunno & Tompkins by C. Stephen Barrett, III, Newark, N. J., for plaintiffs.

Hellring, Lindeman & Landau by Joel D. Siegal, Newark, N. J., for defendants National Cinematape, Inc., American Cartridge Recording, a division of National Communications Arts, Inc., Alexander Magosci, Jr., Davidow-Gellert, Inc., Telecor Industries, Inc., Harold Davidow, Charles Gellert, Grandy, Inc., John French, Audio-Tape, Inc., Elias Saka, Sunshine Music Corporation, American Copyright Research, Inc., and Joseph Barone.

## MEMORANDUM AND ORDER

LACEY, District Judge.

This is an action styled by plaintiffs as one for infringement of the copyrights in plaintiffs' respective copyrighted musical works by the unauthorized manufacture and sale of instruments (recordings) serving to reproduce the same mechanically.

The several defendants represented by Mr. Siegal seek an order relieving them from writs of seizure herein and directing the return of all seized articles.

Four issues had been heretofore raised:

1. Was there technical compliance with the Supreme Court Rules of Practice relating to writs of seizure; and do these Rules violate constitutional provisions?

2. Have the plaintiffs so conducted themselves with respect to these defendants as to require, under equitable principles, imposition of the same sanctions as were imposed with respect to the writ of seizure directed against U. S. Tape, namely, quashing and vacating of said writs?

3. Are the compulsory license provisions of the Copyright Act applicable to the duplication of recordings?

4. If the answer to 3 is "yes," have these defendants complied with the re-

quirements thereof so as not to be infringers?

This opinion is to be read in conjunction with that rendered herein on November 22, 1972 (351 F.Supp. 572) and on June 25, 1973 (362 F.Supp. 488), regarding the motion for summary judgment by the defendants herein, U. S. Tape and George Tucker. Familiarity with both of those opinions is assumed.

One point must be made starkly clear: we deal herein only with copying of recordings fixed before February 15, 1972, since, as has been indicated, effective that day the owners of a mechanical recording were given copyright protection by statutory amendment. *See* Goldstein v. State of California, 412 U.S. 546, 93 S.Ct. 2303, 2307, 37 L.Ed.2d 163 (1973):

> We note at the outset that the federal copyright statutes to which petitioners refer were amended by Congress while their case was pending in the state courts. In 1971, Pub.L. 92–140 was passed to allow federal copyright protection of recordings. However, § 3 of the amendment specifically provides that such protection is to be available only to sound recordings "fixed, published and copyrighted" on and after February 15, 1972, and before January 1, 1975, and that nothing in Title 17, as amended is to "be applied retroactively or [to] be construed as affecting in any way any rights with respect to sound recordings fixed before" February 15, 1972. The recordings which petitioners copied were all "fixed" prior to February 15, 1972. Since, according to the language of § 3 of the amendment, Congress did not intend to alter the legal relationships which govern these recordings, the amendments have no application in petitioners' case. [Footnote omitted]

As is further apparent in *Goldstein*, as to recordings fixed pre-February 15, 1972, the manufacturer thereof, duly licensed by the owner of the musical composition copyright, was itself without copyright protection for such recordings, although, as is implicit in *Goldstein*, the state law of unfair competition and the state police power, where a state elected to make available, or utilize, same, could be resorted to by a licensed recording manufacturer whose product was "pirated" by a record manufacturer. The pre-February 15, 1972, availability of this state remedy, in an area of power granted to Congress by the United States Constitution (Art. I, § 8, cl. 8:

> To promote the Progress of Science and useful Arts, by securing for limited times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries.)

rested upon familiar constitutional principles of congressional non-action in substantive areas of the law, as seen in connection with the Commerce power. Cooley v. Board of Wardens, 12 How. (53 U.S.) 299, 13 L.Ed. 996 (1851). *Cf.* Columbia Broadcasting System, Inc. v. Melody Recordings, Inc., 124 N.J.Super. 322, 306 A.2d 493 (Ch.Div. Essex Co. May 28, 1973, Kimmelman, J.), decided before *Goldstein*, and holding, in reliance upon the exclusivity doctrine, as to patents, enunciated in Sears, Roebuck & Co. v. Stiffel Company, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 66 (1964), and Compco Corp. v. Day-Brite Lighting Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L. Ed.2d 669 (1964), that states could not by grant of an unfair competition cause of action, confer a common law copyright upon a recording fixed pre-February 15, 1972.

To conclude the discussion concerning Pub.L. 92–140, the copyright protection for sound recordings granted thereby does not include a provision for compulsory licensing. This was upheld in Shaab v. Kleindienst, 345 F.Supp. 589, 590 (D.D.C.1972). On the other hand, the compulsory license provisions of 17 U.S.C. § 1(e), and the "notice of intention to use" provisions of 17 U.S.C. § 101(e), were not changed by the new legislation. As it was put in a House of Representatives Report on the new statute, therefore, with respect to records

and tapes which were not "fixed" after February 15, 1972, any person could still engage in record and tape duplication "without violating Federal Copyright law," provided he complied with the compulsory license provisions of the Act. Thus, in my opinion of November 22, 1972, I stated (351 F.Supp. at 584):

> However, Congress did give the music publishers a more effective weapon to deal with the illegal duplicators who did not pay royalty. Section 2 of P.L. 92–140, which unlike § 1 was effective immediately, amended 17 U.S.C. § 101(e) so as to subject those who did not comply with the compulsory license provision of the Act to civil liability "in accordance with all provisions of this title dealing with infringements of copyright and, in the case of a willful infringement for profit, to criminal prosecution pursuant to [17 U.S.C.] § 104."

Thus, the legislative history of P.L. 92–140, and the precise remedies chosen by Congress to deal with the subject, manifest an expressed intent by Congress to permit such tape and record duplication to continue under the compulsory licensing provisions of the Copyright law, with respect to all sound recordings "fixed" prior to February 15, 1972.

I also find persuasive defendant's argument that if Congress had intended to make duplicators liable after October 15, 1971, for infringement of musical composition copyrights, regardless of whether the duplicator complied with the compulsory license provision, Congress could have simply amended § 1(e) by excluding from the benefits thereof those making an "exact" or "identical" copy of a pre-existing recording. Thus, if Congress had desired to make all duplicators immediately liable for infringement of musical composition copyrights, it easily could have done so by restricting the compulsory license privilege in some fashion. Instead, Congress created a new copyright in the sound recordings of performances of copyrighted musical works, effective, however, only with respect to performances on recordings that were "fixed, published and copyrighted" four months after the effective date of the 1971 Amendment. [Footnote omitted]

Against this background, I now turn to the issues hereinabove set forth.

■ 1. Was there technical compliance with the Supreme Court Rules of Practice relating to writs of seizure?

Rules 3 and 4 of the Rules of Practice, adopted by the Supreme Court under the Federal Copyright Laws, set forth the procedures to be followed in impounding alleged infringing items during the pendency of an infringement action. Defendants allege plaintiffs' non-compliance with these procedures in the following respects.

Rule 3 requires that an affidavit in support of seizure be filed with the Clerk of the Court by the plaintiff or complainant or his authorized agent or attorney. In the instant matter affidavits were submitted by Albert Berman and Thomas Tempesta. I can and do infer the requisite agency from the filing of the affidavits herein.

Defendants next allege that there was insufficient compliance with Rule 3. This Rule in pertinent part requires that the information contained in affidavit form shall provide

> . . . upon the best of his [the deponent's] knowledge, information and belief, the number and location, as near as may be, of the alleged infringing copies, records, plates, molds . . . or other means for making the copies alleged to infringe the copyright, and the value of the same
> . . . . .

I find that there was substantial and hence sufficient compliance with this requirement by the plaintiffs.

■ Defendants next point out that Rule 3 requires that a bond be executed by at least two sureties. Defendants argue that the plaintiffs have only fur-

nished a bond executed by one surety. However, Rule 7 provides:

> Within three days after the articles are seized, and a copy of the affidavit, writ and bond are served as hereinbefore provided, the defendant shall serve upon the clerk a notice that he excepts to the amount of the penalty of the bond, or to the sureties of the plaintiff or complainant, or both, otherwise he shall be deemed to have waived all objection to the amount of the penalty of the bond and the sufficiency of the sureties thereon.
>
> . . .

Defendants' objections, therefore, have not been timely made.

Finally, defendants state that Rule 4 requires that such a bond be conditioned for the payment to the defendant of any damages which the court may award to him against the complainant. Defendants then state that the bonds, in the instant matter, only protect the defendants for cost and damages that might be awarded against the plaintiffs and that if the Harry Fox Agency is deemed to be a complainant and damages are awarded against such complainant, there is no provision in the bond to protect the defendants. Again, I find the objection untimely under Rule 7.

■ Defendants next contend that the provisions and procedures of the aforesaid Rules of Practice are unconstitutional and void, in that they assertedly abridge rights protected under the first, fourth and fifth amendments to the United States Constitution. They refer in this connection to a certain report of the Advisory Committee on Rules to the Supreme Court, which in 1966 stated:

> The Advisory Committee has serious doubts as to the desirability of retaining Copyright Rules 3–13 for they appear to be out of keeping with the general attitude of the Federal Rules of Civil Procedure toward remedies anticipating decision on the merits, and objectionable for their failure to require notice or a showing of irreparable injury to the same extent as is customarily required for threshold injunctive relief. However, in view of the fact that Congress is considering proposals to revise the Copyright Act, the Advisory Committee has refrained from making any recommendation regarding Copyright Rules 3–13 but will keep the problem under study. Note following 17 U.S.C.A. § 101

The fact is that there has been no change in the Rules, notwithstanding Copyright Act changes. Thus I can give this note no weight.

■ On the constitutional issue, defendants further state that a seizure and impounding of their duplicating material without an adversary hearing prior to the seizure is a clear violation of the defendants' rights under the first amendment, citing Quantity of Copies of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L.Ed.2d 809 (1964); and Freedman v. Maryland, 380 U.S. 51, 58, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). Since defendants concede they copy the creative works of others I perceive no first amendment issue. Nimmer, "Does Copyright Abridge the First Amendment Guaranties of Free Speech and Press?" 17 UCLA L.Rev. 1180, 1192, 1203–1204 (1970).

■■ Nor do I believe the seizure (*without prior notice and an opportunity to be heard*) is a violation of the defendants' rights under the fifth amendment. Contrary to defendants' position, there is no "inherent disregard of procedural due process." Not in point are Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), and Laprease v. Raymours Furniture Co., 315 F.Supp. 716 (N.D.N.Y.1970). It is fundamental that what "process" is due depends on the circumstances of each case. Here provisions exist to apply for relief from seizure. These are deemed sufficient to comply with Constitutional mandate.

■ Without citing any authority, defendants next claim a fourth amend-

ment violation arose from the challenged seizures. Assuming *arguendo* the fourth amendment is applicable to said seizures, the writs issued as a judicial process following presentation to a "neutral magistrate" of the supporting affidavits. Thus I reject this claim. *Cf.* Oklahoma Press Pub. Co. v. Walling, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614 (1946); In re Grand Jury Subpoena Served Upon Simon Horowitz, 482 F.2d 72 (2d Cir. 1973).

■ Next, defendants claim a violation of Local Rule 14, in that "the Complaint was not verified by the plaintiffs." Assuming there was a violation of this Rule, it at most would be a technical one—not a substantive one—and not of such weight as to have me declare the writs to have been improvidently issued.

Accordingly, I find no merit in defendants' first contention.

■ 2. Have the plaintiffs so conducted themselves with respect to these defendants as to require, under equitable principles, imposition of the same sanctions as were imposed with respect to the writ of seizure directed against U. S. Tape, namely, quashing and vacating of said writs?

My reasons for vacating the writ as against U. S. Tape are set forth in my opinion of November 22, 1972. Some of those reasons are applicable to the writs issued as to these defendants as well. First and foremost, the basic, fundamental and underlying philosophy of plaintiffs, including the Harry Fox Agency, Inc. and the 3,500 music publishers it represents, is wrong: Duchess Music Corporation v. Stern, 458 F.2d 1305 (9th Cir.), cert. denied, 409 U.S. 847, 93 S.Ct. 52, 34 L.Ed.2d 88 (1972), relied upon by plaintiffs, does not correctly state the law.[1] Defendants' use is either a "similar" use and thus they enjoy, as to plain-

tiffs' copyrights, the benefits of the compulsory license provisions of § 101(e), as envisaged by Congress in 1971, or, if an "identical" use, as described in *Duchess,* may not be regarded as infringers at all.

This inevitably follows from the rationale of *Goldstein,* where the Supreme Court, to allow state intervention into the field of musical recording reproduction, necessarily (under its own self-imposed restrictive view) had to find a total absence of congressional action in the area. Certain it is that there was no copyright protection afforded to the record manufacturer. On the other hand, Congress had not spoken as to indicate that this subject matter was to remain free of copyright protection. Nimmer on Copyright thus states (§ 108.3, pp. 420–421):

All of the other rights granted to the copyright owner are exclusive with him. This is also true of the right to record as it relates to non-dramatic literary works and to dramatic works. The situation is more complicated, however, with respect to the right to record as it relates to musical compositions. The Congress which enacted the present Copyright Act was concerned with the possible emergence of "a great music monopoly." In order to avoid such an eventuality it was provided that the right to record musical compositions is an exclusive right only if and to the extent the copyright owner does not permit any recording to be made of the work. Once such a recording has been authorized, thereafter the right to record becomes non-exclusive, subject to the terms and conditions of the compulsory license provision of Sec. 1(e).

With respect to the duplication or re-recording of previously authorized recordings of copyrighted musical com-

---

1. *Duchess* adds confusion as well. The plaintiffs appear to have not only been the owners of copyrights on musical compositions, as here, but also to have "issued . . . phonograph records . . . from copyrighted compositions . . . ." 458 F.2d 1305, 1307. The court never actually clearly defines what interest it is protecting, the statutory copyright or the recording.

positions, Professor Nimmer added (§ 108.4621, pp. 431–432) :

> Assuming such a record pirate duly serves a notice of intent to use, and pays the compulsory license royalties, the somewhat astounding result is that as to those sound recordings fixed prior to February 15, 1972, he is not an infringer under the Copyright Act. The only portion of that which he has recorded which is protectible under the Copyright Act, with respect to sound recordings fixed prior to February 15, 1972, is the musical composition itself, and that he is authorized to use for recording purposes upon payment of the statutory royalties. *All of the other elements contained in the original record which he has without authority duplicated are not copyrightable, and hence his use of such other elements does not give rise to an action for copyright infringement.* [Emphasis supplied]

Careful analysis of *Goldstein* leads me to conclude that the Supreme Court, while finding Congressional inaction as to what Nimmer refers to as "As of the other elements contained in the original record which . . . [was] without authority duplicated", nonetheless took cognizance of, and found not inconsistent with the *Goldstein*-approved State action, application of the compulsory license provisions of § 101(e).

■■■ Accordingly, if plaintiffs are entitled to any protection herein, it is only with respect to their *own* copyright, in their musical compositions, and cannot, under the guise of claiming that the compulsory licensing provision does not apply, claim an infringement where to do so would of necessity require finding that Congress had touched activity which *Goldstein* clearly states had not been touched pre-February 15, 1972.[2]

As I have stated, this is an action for infringements of plaintiffs' respective copyrighted musical works by the unauthorized manufacture and sale of tape recordings serving to reproduce the same mechanically. Plaintiffs have claimed seemingly (a) that under no circumstances can defendants' activity be non-infringing, a contention that my aforesaid review of *Goldstein* puts to rest; and (b) that, even if the compulsory licensing provisions of § 101(e) are available to defendants, they are infringers because they have not filed notices of intention or paid royalties.

I relied heavily if not exclusively upon the Berman affidavit, and its allegations such as:

> 3 . . . As the bootleggers make no royalty payments, the music publishers receive no return for such uses of their valuable property, and the authors who are compensated through royalties from the music publishers, therefore, receive no compensation for such uses of the fruits of their respective labors . . . The bootleggers thrive upon elimination of payments of royalties to copyright proprietors and recording artists, both of which legitimate manufacturers are required to pay.

Moreover, to color the flavor of the charge that the "bootleggers" violate the plaintiff's property rights, the Berman affidavit uses the words "illicit," "clandestine," and other lurid language. At the time, New Jersey did not, and does not today, punish as a crime such activity; and as to pre-February 15, 1972, activity, no copyright was infringed—unless the compulsory license provisions were not complied with. What then was the situation with respect thereto, insofar as I was advised by plaintiffs at the time they submitted their papers and sought writs of seizure?

2. The Berman affidavit notes that the Harry Fox Agency is not only "responsible for collecting royalties accruing to its music publisher principals . . . [but also for] aiding the enforcement through- out the United States of the rights of mechanical reproduction against unauthorized users thereof . . . . . (Para. 2).

Astonishingly, while telling me defendants were not paying royalties, plaintiffs knew they were! In what amount is of course not clear. What is clear, however, is that plaintiffs had taken a firm and unalterable position that no recognition would be given to defendants' rights to invoke the compulsory license provision; and, indeed, many checks from defendants, intended as royalty payments, were returned by plaintiffs in line with that policy.

It also appears that many of the defendants submitted Notices of Use (Clark affidavit of November 10, 1972, pp. 4–5). Yet the impression was deliberately conveyed that defendants were acting in complete disregard of the compulsory licensing provisions.

The aforesaid Clark affidavit proceeds on a false assumption. Seemingly, Mr. Clark believes the issue before me is whether defendants are, or are not, infringers. That is not the issue. The issue is, were the writs of seizure obtained on a false presentation? Had I been provided with all the facts, rather than the highly colored Berman and Tempesta affidavits, I would not have ordered the writs to issue.[3]

Accordingly, the answer to the question raised as to whether the same sanction should be imposed as to the defendants other than U.S. Tape as was imposed on the latter is an affirmative one, and the writs will be vacated.

■ 3. Are the compulsory license provisions of the Copyright Act applicable to the duplication of recordings?

Obviously the answer to this question is "Yes," for the reasons hereinabove set forth.

■ 4. If the answer to 3 is "yes" have these defendants complied with the requirements thereof so as not to be infringers?

The answer to this question still must remain open. Recent events, such as the F.B.I. raids in the past week, indicate that not only the plaintiffs' interests, but the public's interest as well, mandates that discovery go forward on the issue of whether defendants did in fact

---

3. Specific portions of the Berman deposition, taken by defendants *after* issuance of the writs, are illustrative of the misleading content of that man's affidavit. *See* as to Davidow-Gellert, Inc., dep. at pp. 10, 12; as to Telecor Industries, Inc., pp. 14, 15–16, 20. Moreover, it indicated that plaintiffs' view was that, notwithstanding the filing of notices and the payment of royalties, even if in the correct amount, defendants' activity is "prohibited activity" and for that reason plaintiffs do not want to investigate the methods used for the filing of notices and the royalty payments. (p. 21) *See also*, p. 20, indicating royalties were paid. He used the word "clandestine" because "no one came forward from Telecor as a principal. Everything was conducted through attorneys . . . ." (at 31). He then added that later notices were sent by Telecor from a Box Number. Asked if he ever looked in a phone book to see whether Telecor listed its address in Fairfield, he did not answer responsively except to say an address does not necessarily mean that it is not a clandestine operation. (at 32). He never asked the attorneys who wrote to him for the names of their principals. Nonetheless he felt that Telecor concealed its location because "they work through an attorney who didn't volunteer their location." However he did not ask their attorney their location (at 33.) Para. 5 of his affidavit refers to telephone answering services, but he does not know whether or not Telecor has an answering service (at 39–40). As to the use of "phony names," he did know Telecor was a duly incorporated entity in New Jersey (at 40.) With respect to the use of post office boxes, he recognized that there are companies that he deals with that do use post office boxes (at 41). He accepts the fact that there are duplicators that are not clandestine or hidden (at 42). He has never examined Telecor equipment. *He admitted that it was a fact that the reason he wanted the equipment seized is not because of the so-called clandestine nature or non-payment of royalties or non-filing of notices of use but because he regards duplication activity as illegal* (at 43–44). This short analysis indicates why I believe this Court was put upon, particularly when coupled with what I found as to the allegations, respecting U.S. Tape, which the Berman affidavit contained.

do what they say they did, comply substantially with the compulsory license provision.

Accordingly, it is ordered this 27th day of June, 1973, as follows:

1. The writs of seizure, as to all moving defendants are quashed and vacated and the materials seized thereunder shall be returned within five days.

2. Stays previously entered respecting discovery are vacated and discovery is to proceed, to be completed within 30 days. While said discovery is permitted to include defendants' customers and suppliers, it is to be done under conditions and circumstances which shall not be unduly burdensome or harassing, and not in bad faith.[4]

4. Defendants of course are not without remedy under Fed.R.Civ.P. 26(c) if this mandate is violated.