**JONDORA MUSIC PUBLISHING COMPANY et al., Plaintiffs,**

v.

**MELODY RECORDINGS, INC., et al., Defendants.**

**Civ. A. No. 1741–72.**

United States District Court,
D. New Jersey.

June 26, 1973.

See also, D.C., 362 F.Supp. 494.

Abeles, Clark & Osterberg, New York City, Lum, Biunno & Tompkins by C. Stephen Barrett, III, Newark, N. J., for plaintiffs.

Glauberman & Weiss by Sheldon A. Weiss, Jersey City, N. J., for defendants, U.S. Tape, Inc. and George Tucker.

## OPINION

LACEY, District Judge:

Defendants U.S. Tape Inc. and George Tucker move for the entry of summary judgment pursuant to Federal Rule 56(e), contending that the pleadings, depositions and affidavits herein evidence that there is no genuine issue as to any material fact and that they thereby are entitled to judgment. More specifically, they contend (a) the affidavits and depositions of Mr. Berman, taken November 2, 1972, show that there is no genuine issue as to U.S. Tape's compliance with the compulsory license provisions of the Copyright Act as applied, as more particularly appears from the Court's Memorandum Opinion dated November 22, 1972, and (b) that this Court has already held in said Memorandum Opinion, that by reason thereof, U.S. Tape's activities in no way infringe upon plaintiffs' musical composition copyrights.

Plaintiffs resist this motion on two principal grounds, first, that Duchess Music Corporation v. Stern, 458 F.2d 1305 (9 Cir.), cert. denied, 409 U.S. 847, 93 S.Ct. 52, 34 L.Ed.2d 88 (1972), was correctly decided, and that this Court was in error in expressly finding otherwise in its Memorandum Opinion, at 351 F.Supp. 572 (D.N.J. 1972); and second, that even if the compulsory licensing provisions of the Copyright Act, 17 U. S.C. § 1 et seq., apply, the moving defendants are infringers of the plaintiffs' musical composition copyright.

I shall first review my holding of November, 1972, and then analyze its present application, on this motion, in the light of last week's Supreme Court decision in Goldstein v. State of California, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed. 2d 163 (1973).

I was faced with this legal question: did Congress by the Copyright Act of 1909 grant to musical composition copyright holders the power to prevent third persons from copying a particular performance of that composition, where (a) with the copyright holder's permission, the performance has already been fixed on a physical object capable of reproducing it, and (b) the third person has complied with the compulsory license provisions of the Act by filing and serving notices of intention.

Construction was required of the remedial and compulsory licensing provisions of the Copyright Act of 1909, 17 U.S.C. §§ 1(e) and 101(c), (d) and (e), which relate to copyright protection for musical compositions and its application to sound recordings.

The defendants contended they owed only an obligation to plaintiffs to pay them the statutory 2¢ per performance of their musical compositions, under 17 U.S.C. § 1(e), which in pertinent part reads as follows:

> Provided . . . as a condition of extending the copyright control to such mechanical reproductions, that whenever the owner of a musical copyright has used or permitted or knowingly acquiesced in the use of the copyrighted work upon the parts of instruments serving to reproduce mechanically the musical work, any other person may make similar use of the copyrighted work upon the payment to the copyright proprietor of a royalty of 2 cents on each such part manufactured, to be paid by the manufacturer thereof . . . .

Defendants claim plaintiffs, having licensed the use of their compositions to the major recording companies, are bound under § 1(e)'s compulsory licensing provision to permit defendants to use the composition as well, even though such use is a copying of the recording as theretofore licensed to the major recording company. Defendants add that they

have filed the requisite notices of intention, and made (or tendered) the requisite royalty payments, all of which I had previously credited in view of the then state of the record. Plaintiffs on the other hand contended that the "compulsory license" provision is not available to a duplicator of the recordings of the licensees of the copyright proprietor. Plaintiffs relied upon the Court of Appeals decision in *Duchess, supra,* which in pertinent part stated (458 F.2d at 1310–1311):

> The statute provides that anyone who properly invokes the license provision "may make *similar use* of the copyrighted work." (emphasis supplied) Rosner admits that she duplicates appellants' copyrighted compositions. She does not make "similar use" of them, she makes exact and identical copies of them. This is clearly outside the scope of the compulsory license scheme.
>
> . . . Rosner may, of course, record appellants' songs, when she hires musicians, artists, and technicians. Instead, she steals the genius and talent of others. She deceives others into thinking that her tapes represent her own work. She has no "right to copy." *See* Capitol Records, Inc. v. Greatest Records, Inc., 43 Misc.2d 878, 252 N.Y.S.2d 553 (S.Ct., 1964). She may not continue her piracy under the flag of compulsory licensing.

Accordingly, to afford the licensee a remedy against such "piracy," the court concluded that not only the copyright owner, but its licensee, alone, could invoke the general injunction provision of the Act against such practice.

I stated that I felt that *Duchess* was wrongly decided, and wrote (351 F. Supp. at 580):

> It is my view that the *Duchess* opinion in the Court of Appeals erroneously interprets the "compulsory license" provision of the Copyright Act. Simply stated, that court believed that because a musical composition is copyrighted, the unauthorized reproduction of the performance embodied in the sound recording of that composition is, and ought to be, prohibited by federal copyright laws. But that clearly was not the law when *Duchess* was decided. Neither performance nor recording was copyrightable. It might have been unethical, or, in some states, because there was a felt necessity for statutory intervention, a crime to "steal" a recording of a performance and thereafter sell it as your own. But clearly the licensee-manufacturer had no claim under the Copyright Act. . . .

Plaintiffs had argued that it would be unconscionable to allow defendants to copy the recordings of licensees when, in certain states, to do so was a crime. I responded (351 F.Supp. at 581):

> Plaintiffs argue it would be inconceivable to afford duplicators the benefit of the "compulsory license" provision and thereby allow a duplicator to do that which is a crime, or unfair competition, under state law. Their argument carries them too far. It is precisely because licensee-manufacturers had no relief under the Copyright Law where the Copyright holder accepted the "compulsory license" royalties that the national recording companies got state legislation on the books. . . .

Additionally, I pointed out that Public Law 92–140, the Sound Recording Amendment of 1971, by its content and its legislative history, demonstrated legislative thought and intent. Both the Senate and House Reports stated that under the former state of the law:

> If the unauthorized producers pay the statutory mechanical royalty required by the Copyright Act for the use of copyrighted music, there is no Federal remedy currently available to combat the unauthorized reproduction of the recording . . .

> \* \* \* \* \* \*

> The enactment of S. 646 will mark the first recognition in American copy-

right law of sound recordings as copyrightable works." S.R. 92–72, p. 4; H.R. 92–487, pp. 2 and 5, U.S.Code Cong. & Admin.News 1971, pp. 1566, 1567, 1570.

The House Report also states that any persons who "satisfy the claim of the owner of the musical copyright . . . ." [i. e., by filing the appropriate notice of intention to use and paying the statutory royalty] "can and do engage in wide-spread unauthorized reproduction of phonograph records and tapes without violating Federal copyright law." H.R., 92–487, p. 2, U.S.Code Cong. & Admin.News 1971, p. 1567.

To remedy the situation, Congress, in § 1 of Public Law 92–140, created a limited copyright in sound recordings of performances of musical compositions. However, Congress also provided in § 3 of the Amendment that:

> The provisions of Title 17, United States Code, as amended by Section 1 of this Act shall apply only to sound recordings fixed, published and copyrighted on and after the effective date of this Act [i. e., February 15, 1972] and before January 1, 1975, and nothing in title 17, United States Code, as amended by section 1 of this Act, shall be applied retroactively or be construed as affecting in any way any rights with respect to sound recordings fixed before the effective date of this Act.

Thus, the record companies, which theretofore had no federal copyright protection for their recordings, or for the musical performances they served to reproduce, were afforded a sound recording copyright. But such protection was given only prospectively—it applied only to sound recordings that were "fixed [i. e., first recorded], published, and copyrighted" after February 15, 1972.

■ Plaintiffs, of course did not and cannot invoke herein this newly-created "sound recording" copyright, because (a) the records which defendants duplicated all were "fixed" (first recorded) prior to February 15, 1972 and (b) the plaintiffs-publishers would not, in any event, own the copyrights to the post-February 15, 1972 sound recordings. Rather those rights inure to the benefit of the record companies, which hire the musicians, artists and technicians involved in creating the musical performances.

Goldstein v. State of California

The antagonists on this motion have, at my invitation, submitted supplemental memoranda dealing with the impact, if any, of *Goldstein* upon the case at bar. Movants argue that directly *Goldstein* does no more than uphold the validity of State legislation, passed under the reserved police powers and in the absence of Congress activity in the field, which punishes record piracy as a crime. Movants also note that as to musical compositions, Congress had acted to afford copyright protection, subject of course to the compulsory licensing provision.

Plaintiffs, on the other hand, contend that *Goldstein* "supports . . . *Duchess* . . . and, therefore, provides an additional basis for denial of the motion for summary judgment." I disagree, and I adhere to my previously expressed views on *Duchess*.

The key to understanding *Goldstein* lies in recognition of well settled principles of fundamental constitutional law. The Supreme Court treats the constitutional grant of Copyright power to Congress (Art. I, § 8, cl. 8), "To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries", like the commerce power, holding that the grant "does not provide that such power shall vest exclusively in the Federal Government." The Supreme Court added 412 U.S., p. 553, 93 S.Ct. p. 2308:

> . . . Nor does the Constitution expressly provide that such power shall not be exercised by the States. In applying the third phase of the test, we must examine the manner in

which the power to grant copyrights may operate in our federal system. The objectives of our inquiry were recognized in Cooley v. Board of Wardens, 12 How. (53 U.S.) 299, 13 L.Ed. 996 (1851), when, in determining whether the power granted to Congress to regulate commerce was "compatible with the existence of a similar power in the States," the Court noted:

"Whatever subjects of this power are in their nature national, or admit of only one uniform system, or plan of regulation, may justly be said to be of such a nature as to require exclusive legislation by Congress." 12 How. (53 U.S.), at 319.

The Court's determination that Congress alone may legislate over matters which are *necessarily* national in import reflects the basic principle of federalism. "The genius and character of the [federal] government," Chief Justice Marshall said,

seems to be, that its action is to be applied to all external concerns of the nation, and to those internal concerns which affect the States generally; but not to those which are completely within a particular State, which do not affect other States, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of government. Gibbons v. Ogden, 9 Wheat. (22 U.S.) 1, 195, 6 L.Ed. 23 (1824). [Footnotes omitted] [emphasis in original]

Significant thereafter is the Court's statement that "The objective of the Copyright Clause was clearly to facilitate the granting of rights national in scope." (at 555, 93 S.Ct., at 2309). The Court followed this by pointing out the burden on an author who would wish to achieve protection in all States when no federal system of protection is available. The Copyright Clause thus "allows Congress to provide a reward greater in scope than any particular State may grant to promote progress in those fields which Congress determines are

worthy of national action." (*Id.*, at 556, 93 S.Ct., at 2309). On the other hand, the Court construes the Copyright Clause as not indicating "that all writings are of national interest or that state legislation is, in all cases, unnecessary or precluded." (*Id.*, at 557, 93 S. Ct., at 2310).

The Court then finds (applying Cooley v. Board of Wardens doctrine), that where the subject matter to which the Copyright Clause is addressed may be purely of local importance "and not worthy of national attention or protection," a state may grant copyright protection. However,

. . . At any time Congress determines that a particular category of "writing" is worthy of national protection and the incidental expenses of federal administration, federal copyright protection may be authorized.

\* \* \*

. . . No reason exists why Congress must take affirmative action either to authorize protection of all categories of writings or to free them from all restraint.

It is clear then that Congress, as to pre-February 15, 1972, sound recordings, is taken by the Court to have refrained from acting, (a) either to grant copyright protection or (b) to state its intention that such be free of protection. The Court's opinion leaves no doubt that had Congress done either, in order to accomplish or establish a national policy, the States could not have intervened. This is explicitly set forth (*Id.*, at 559, 93 S.Ct. at 2311):

Where the need for free and unrestricted distribution of a writing is thought to be required by the national interest, the Copyright Clause and the Commerce Clause would allow Congress to eschew all protection. In such cases, a conflict would develop if a State attempted to protect that which Congress intended to be free from restraint or to free that which Congress had protected. However, where Congress determines that nei-

ther federal protection nor freedom from restraint is required by the national interest, it is at liberty to stay its hand entirely. Since state protection would not then conflict with federal action, total relinquishment of the States' power to grant copyright protection cannot be inferred. [footnote omitted]

■ Thus, under pre-February 15, 1972, law, where the States are free to grant what is the equivalent of state copyright protection, it is clear that Congress has not exercised its copyright powers. Thus, if plaintiffs' view—and the view of the *Duchess* court—were sound, that is, that mechanical recordings enjoyed federal copyright protection before February 15, 1972, not only would there be no need for state action, state action would be barred, since Congress would have indicated its felt view that a *national uniform policy was necessary*, and not a piecemeal state-by-state approach.

The Court next traced the history of Congressional legislation in the copyright area under Art. 1, § 8, Cl. 8. The Court stated (*Id.,* at 562, 93 S.Ct. at 2312):

. . . The history of federal copyright statutes indicates that the congressional determination to consider specific classes of writings is dependent not only on the character of the writing, but also on the commercial importance of the product to the national economy. As our technology has expanded the means available for creative activity and has provided economical means for reproducing manifestations of such activity, new areas of federal protection have been initiated.[17]

The footnote at the conclusion of the foregoing quotation is a significant one. It traces the specific legislation and then states:

Finally, in 1971, § 5 was amended to include "sound recordings." Congress was spurred to action by the growth of record piracy, which was in turn

due partly to technological advances. See Hearings on S. 646 and H.R. 6927, *supra,* n. 5, at 4–5, 11 (1971). It must be remembered that the "record piracy" charged against petitioners related to recordings fixed by the original producer prior to Feb. 15, 1972, the effective date of the 1971 Act. . . .

Again it is plainly stated—there was no federal copyright protection before February 15, 1972, of sound recordings.

If more be needed, the Court recognized there might be a conflict between federal copyright coverage of mechanical recordings, and like State legislation, and said (*Id.,* at 571, 93 S.Ct. at 2317):

In sum, we have shown that § 653h does not conflict with the federal copyright statute enacted by Congress in 1909. Similarly, no conflict exists between the federal copyright statute passed in 1971 and the present application of § 653h, since California charged petitioners only with copying recordings fixed prior to February 15, 1972. Finally, we have concluded that our decisions in *Sears* [Sears Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661] and *Compco* [Compco Corp. v. Day-Brite Lighting Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669], which we reaffirm today, have no application in the present case, since Congress has indicated neither that it wishes to protect, nor to free from protection, recordings of musical performances fixed prior to February 15, 1972. [footnote omitted]

*See also,* dissenting opinion of Justice Douglas at 573–574, 93 S.Ct. at 2318:

Prior to February 25, 1972, copyright protection was not extended to sound recordings. . . .

\* \* \*

Prior to February 15, 1972, sound recordings had no copyright protection. And even under that Act the copyright would be effective "only to sound recordings fixed, published, and copyrighted on and after the effective

date of this Act (February 15, 1972) and before January 1, 1975." [footnotes omitted].

Accordingly, if defendants are infringers, they are not infringers of the property in mechanical sound recordings; and thus I reject once again the *Duchess* doctrine.[1]

■ This does not end the matter, however. Still at issue is whether defendants are guilty of infringement of the copyrighted musical compositions of plaintiffs by virtue of failure to comply with notice of intention and royalty requirements. On this issue plaintiffs claim they are entitled to further discovery, referring to Fed.R.Civ.P. 56(f) and 6 Moore's Federal Practice (2d ed.), ¶ 56.15[5], at p. 2401.

I have been concerned about the possibility of plaintiffs abusing the discovery device, to defendants' detriment. A substantial part of my fear in this regard is attributable to the past conduct of plaintiffs herein, as detailed in my Memorandum Opinion.

Last week, however, the defendant corporation on this motion was subjected to a search and seizure by the Federal Bureau of Investigation, in execution of a search warrant by Special Agent Palumbo. It is clear to me that apprehension previously expressed by defendants, that discovery of their customers would result in irreparable injury to them, by reason of intimidation of said customers and the like, no longer has a sound basis. The pressures inherent in such discovery are minimal, when aligned with those which I must now sense their customers feel as a result of the recent events.

Accordingly, summary judgment is denied as to both movants, without prejudice to renewal thereof upon completion of discovery.

Defendants of course are not without recourse should discovery prove too bur-

densome, harassing, or in bad faith. Fed.R.Civ.P. 26(c).

Submit an appropriate form of Order not later than June 28, 1973.

June 28, 1973.

---

1. It is not without significance that *Goldstein* omits citation of *Duchess*, particularly since virtually every Brief submitted by those opposed to the petitioners (including *amici curiae* such as representatives of some of the plaintiffs herein) relied upon *Duchess*.