**JONDORA MUSIC PUBLISHING
COMPANY et al.,
Plaintiffs-Appellants,**

v.

**MELODY RECORDINGS, INC., et al.,
Defendants-Appellees.**

No. 74–1241.

United States Court of Appeals,
Third Circuit.

Argued Oct. 25, 1974.

Decided Dec. 27, 1974.

As Amended Jan. 16, 23, 1975.

Sidney S. Rosdeitcher, Steven B. Rosenfeld, New York City, C. Stephen Barrett, III, Newark, N. J., for plaintiffs-appellants; Daniel J. Kornstein, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Lum, Biunno & Tompkins, Newark, N. J., of counsel.

Sheldon A. Weiss, Glauberman & Weiss, Jersey City, N. J., for appellees U. S. Tape, Inc. and George Tucker.

Hellring, Lindeman & Landau, Newark, N. J., for appellees National Cinematape, Inc., American Cartridge Recording, a division of National Communications Arts, Inc., Alexander Magosci, Jr., Davidow Gellert, Inc., Telecor Industries, Inc., Harold Davidow, Charles Gellert, Grandy, Inc., John French, Audiotape, Inc., Elias Saka, Sunshine Music Corp., Incentives, Inc., Byron Hawley, American Copyright Research, Inc., and Joseph Barone; Joel D. Siegal, Newark, N. J., of counsel; Joshua A. Kalkstein, Newark, N. J., on the brief.

Before KALODNER, GIBBONS and WEIS, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

To a schoolboy, "piracy" may mean swashbuckling adventure, lumbering merchantmen, booty, and the Jolly Roger. To a musical composer or a record manufacturer, however, piracy means not doubloons, but dollars, not cutlasses, but cut-rate losses, not the creaking of a ship under way, but the almost imperceptible hum of a reel-to-reel tape, and certainly no jollity about unauthorized copies of a musical work. We conclude here that a composer is not defenseless but, using the guns of the Copyright Act, can force the pirate to heave to in response to an injunctive shot across the bow.

The plaintiffs are publishers who own the copyrights for a number of musical compositions[1] and thus stand in the shoes of the composers of the musical works. The defendants manufacture and sell sound-tape duplications of popular phonograph records.[2]

Suit was brought in the district court on the allegation that the defendants had infringed the rights granted to the composers by the Copyright Act, 17 U.S.C. § 1 et seq. The district court denied relief, holding that the compulsory license provision, 17 U.S.C. § 1(e), serves to insulate the defendants from liability.[3]

This particular provision of the Copyright Act was passed by Congress in 1909 after the Supreme Court in White-Smith Music Publishing Co. v. Apollo Co., 209 U.S. 1, 28 S.Ct. 319, 52 L.Ed. 655 (1908), had decided that a composer could not copyright a perforated piano roll of his musical work. Although it desired to give protection to the composer, Congress wished to avoid granting a monopoly to a certain company which then held a dominant position in the piano roll manufacturing field. The problem was solved by a legislative compromise which granted the composer protection from unauthorized recording of an unreleased work. If, however, the composer chose to license one manufacturer to make mechanical reproductions,[4] others would be allowed to record the composition upon payment of a specified royalty. The pertinent provision of the statute reads:

---

1. Some of the songs involved are: "I Believe," "Raindrops Keep Fallin' on my Head," and "Blowin' in the Wind."

2. Included in this case are recordings by Johnny Cash, Elvis Presley, Bob Dylan, and George Harrison.

3. The opinions of the district court are reported at 351 F.Supp. 572 (D.N.J.1972); 362 F.Supp. 488 (D.N.J.1973); and 362 F.Supp. 494 (D.N.J.1973).

4. We see no need in this case to enter the debate over the contention that the statute would not apply to electronic recording since it was unknown in 1909 (although the use of phonograph records was widespread at the time). See Henn, The Compulsory License Provisions of the U.S. Copyright Law (1956), Studies on Copyright Law Revision For the Subcomm. on Patents, Trademarks, and Copyrights of the Senate Comm. on the Judiciary, 86th Cong., 1st Sess., Study No. 5 at 17 n. 59 (S.Comm. Print 1960).

". . . And as a condition of extending the copyright control to such mechanical reproductions, that whenever the owner of a musical copyright has used or permitted or knowingly acquiesced in the use of the copyrighted work upon the parts of instruments serving to reproduce mechanically the musical work, any other person may make similar use of the copyrighted work upon the payment to the copyright proprietor of a royalty of 2 cents on each such part manufactured, to be paid by the manufacturer thereof; . . ."

17 U.S.C. § 1(e).

The composer is thus given the right to select the licensee who will originally produce a record of the musical work, but thereafter any other manufacturer can also record the composition pursuant to this compulsory licensing provision. The effect of the statute is to impose three obligations upon those other than the original manufacturer:

1. To pay a royalty of two cents per record;

2. To file a notice of intent to use; and

3. To make a "similar use of the copyrighted work."

The phrase, "similar use of the copyrighted work," is the essence of this case.

There has been surprisingly little litigation on the meaning of the phrase, and the few appellate cases interpreting it in terms of the rights of the composer have occurred within recent years.

The first case to construe the language of the amendment of 1909 was Aeolian Co. v. Royal Music Roll Co., 196 F. 926 (W.D.N.Y.1912). The district court there said of "similar use:"

". . . but the subsequent user does not thereby secure the right to copy the perforated rolls or records. He cannot avail himself of the skill and labor of the original manufacturer of the perforated roll or record by copying or duplicating the same, but must resort to the copyrighted composition or sheet music, and not pirate the work of a competitor who has made an original perforated roll."

196 F. at 927.

This case has been criticized for the result it reached, and the strength of the interpretation consequently has been questioned.[5]

In the years following the *Aeolian* case, most of the writers in the field were preoccupied with the problem of copyright for the physical recording itself.[6] Until Congress recently provided otherwise, it was generally conceded that a record as such could not be copyrighted. *See* Capitol Records v. Mercury Records Corp., 221 F.2d 657 (2d Cir. 1955); Ringer, The Unauthorized Duplication of Sound Recordings, *supra.* Hence, the efforts of performers and manufacturers to secure relief from record piracy were unavailing under the Copyright Act, and debate continued on the desirability of extending protection to recordings, per se.

Within the past few years, however, record "pirates" or "duplicators," [7] were

---

5. The *Aeolian* court recognized that music rolls or records were not, per se, subject to copyright but allowed the plaintiff-licensee-manufacturer an injunction as a "party aggrieved" under the Copyright Act. It is this holding that is incorrect. *See* Note, Piracy on Records, 5 Stan.L.Rev. 433, 443 (1953).

6. *E. g.,* in the oft cited Ringer, The Unauthorized Duplication of Sound Recordings, Studies on Copyright Law Revision For the Subcomm. on Patents, Trademarks, and Copyrights of the Senate Comm. on the Judiciary, 86th Cong., 2d Sess., Study No. 26 (S.Comm. Print 1961), the author states preliminarily, "The right of an author to control sound recordings of his work is outside the scope of

this paper. What we are concerned with are the rights of performers and record producers to prevent unauthorized duplication of their own contributions to the record." *See also,* Chafee, Reflections on the Law of Copyright: II, 45 Colum.L.Rev. 7119 (1945); Kalodner & Vance, The Relation Between Federal and State Protection of Literary and Artistic Property, 72 Harv.L.Rev. 719 (1959); Note, Piracy on Records, 5 Stan.L.Rev. 433 (1953).

7. We use these two words interchangeably with no particular significance attached to the choice. The plaintiffs here prefer the pejorative overtones of "piracy," and the defendants, understandably, prefer the more innocuous "duplicators."

confronted by direct challenges of the composers.[8]

In Duchess Music Corp. v. Stern, 458 F.2d 1305 (9th Cir.), cert. denied, 409 U.S. 847, 93 S.Ct. 52, 34 L.Ed.2d 88 (1972), and Edward B. Marks Music Corp. v. Colorado Magnetics, Inc., 497 F.2d 285 (10th Cir. 1974), aff'd on rehearing in banc, cert. denied, —— U.S. ——, 95 S.Ct. 801, 42 L.Ed.2d 819, (No. 73–2006, Jan. 20, 1975), the Courts of Appeals held for the composers, though not without some voices of dissent. In both instances the majorities held that "similar use" under the compulsory license provision did not apply to those who made duplicates from authorized recordings.

The *Duchess* court reviewed the legislative history of the 1909 amendment and gave favorable consideration to the language interpretation of Aeolian Co. v. Royal Music Roll Co., *supra*. The Court of Appeals for the Tenth Circuit, in discussing the phrase, "any other person may make similar use of the copyrighted work," said:

"This means, to us, that one who complies with royalty payment called for by the statute, though not having any authorization from the copyright owner, may nonetheless then 'use,' not a third party's record, but the copyrighted composition, which has been characterized as the 'raw material,' in a manner 'similar' to that employed by the recording company which did have authorization from the copyright owner . . . [U]nder the statute [defendants] . . . may 'use' the copyrighted composition in a manner 'similar' to that made by the licensed recording company . . . It does not mean that [defendants] . . .

may use the composer's copyrighted work by duplicating and copying the record of a licensed recording company. Such, in our view, is not a *similar* use." [9]   497 F.2d at 288.

■   We agree with this interpretation of the statute but feel even more strongly that the duplicators or pirates do not "use" the composer's work in a "similar" fashion—indeed, they do not utilize the composer's work at all. It is a recording which is used. Rather than permit the use of a recording of the composition, the statute only authorizes the use of the copyrighted work, that is, the written score.

The use to which the original licensee put the composer's work, *i. e.,* the musical score, was much more elaborate, involving as it did the preparation of an arrangement from the written composition and its performance by musicians and vocalists. The mere duplication of a recording by the pirate is not the same as, or "similar" to, the efforts made by the original licensee in utilizing the characters on a piece of paper as the basic plan for producing harmonious sounds.[10]

■   The copyright law is enacted for the benefit of the composer in accordance with the constitutional grant of Art. I, § 8, cl. 8:

"The Congress shall have Power   .   .

"To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."

The amendment of 1909 was intended to protect the creative efforts of the composer, and the compulsory license provision was inserted, not in an effort to penalize him, but to prevent monopoliza-

---

**8.** One reason for these recent cases may be the increased remedies provided to the composers by Pub.L. 92–140, effective October 15, 1971, 17 U.S.C. § 101(e). Before that time, no criminal sanctions were available to the composer for violation of the compulsory license provision, and he was limited to injunctive relief and civil damages not to exceed three times the statutory royalty.

**9.** Nimmer on Copyright, § 108.4621 (1973 ed.), disagrees with this interpretation, but we

are not persuaded by that eminent author's argument to the contrary.

**10.** To put the concept in a different setting—the court reporter, who listens to the sound of a witness's voice, makes notes on a stenotype machine, and then types the words on sheets of paper, makes use of the witness's oral statements. A person who simply photocopies the transcript does not make the same or a similar use of the witness's voice sounds.

tion by manufacturers. The statute should be interpreted in that spirit.

The interest of the composer may be adversely affected by the pirating of licensed recordings. The decision by a manufacturer to make a recording of a musical work necessarily involves consideration of the expense in obtaining outstanding performers and arrangers, as well as the initial cost of the master recording. These factors must be balanced against the anticipated number of copies to be sold. Generally, the life of a popular song recording is a short one. If a record producer can arrange for the happy combination of an outstanding performer and an exceptional song, he will be able to sell enough records to make a profit. Since the pirate's only initial expense is the purchase of one phonograph record or sound tape, he obviously can sell a duplicate at a substantially lower price. If the market is reduced by these cut-rate copies, the record manufacturer's incentive to market other hit recordings is necessarily diminished. In turn, this is a detriment to the composer, who may anticipate that his works will be performed in a less costly production and possibly receive less public attention. To this extent, the interests of the composer and manufacturer coincide in combating piracy.[11]

■ The Supreme Court has not yet spoken on the issue before this court. Its closest approach was in Goldstein v. California, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973), where the Court held that recordings, in and of themselves, were not copyrightable until 1971, when Congress amended the Act to permit such protection for producers and performers. The Court decided that since Congress had not made the Act applicable to any recording "fixed" before February 15, 1972, there was no constitutional impediment to state statutes prohibiting piracy of records prepared before the effective date. The duplicators in that case did not argue that there was any direct conflict between the state regulation and the compulsory license provision of § 1(e).[12] Again in Goldstein as in the earlier cases, the issue was focused upon the question of copyrighting the record itself—not on the rights of the composer. We agree with the Marks court and the court below that Goldstein did not pass on the issue here—the nature and extent of the interest of the composer.

■■ When Congress did amend the Copyright Act in 1971 to provide protection for sound recordings, the legislative history reviewed one phase of the problem to be corrected. The district court in its opinion relied upon statements in both the House and Senate Reports to the effect that under the former state of the law, if the "unauthorized" producers paid the statutory royalty, there was no federal remedy available to prevent unauthorized reproduction of the recording. But a court is not bound by a congressional interpretation of a statute passed in a preceding session. The weight to be given a legislative committee's views on the meaning of a statute enacted in years past is the same as that given to any other commentator—having due regard to whether the subject was specifically addressed and to the objective of the committee work.[13]

11. In Note, Record Piracy and Copyright: Present Inadequacies and Future Overkill, 23 Maine L.Rev. 359 (1972), the author points out that not all piracy is concerned with making money on hit records but that some duplicators make possible the preservation of recordings, particularly in the jazz and classical fields, which were not commercially successful and were prematurely withdrawn from the market by profit-conscious manufacturers.

12. While an argument might be made that our interpretation of "similar use" leads to a conclusion that Congress intended to pre-

empt the field of sound recording protections, the thrust of the Goldstein opinion was to give a narrow interpretation to pre-emption in the copyright field. Furthermore, it bears repeating that while the interests in composition and recording at times may track closely, they are separate and distinct—as an example, a duplication of a recording of a musical work in the public domain would not infringe the rights of any composer but might be a real detriment to the performer.

13. See Kurlantzick, The Constitutionality of State Law Protection of Sound Recordings, 5

Furthermore, we note that, in discussing a proposal for a compulsory license for recordings, the legislative report reads:

"The Senate Committee rejected this proposal on the ground that the two situations are not parallel: the existing compulsory license [under § 1(e)] merely provides access to the copyrighted musical composition, which is the 'raw material' of a recording, and the performers, arrangers, and recording artists are needed to produce the finished creative work in the form of a distinctive sound recording." 1971 U.S.Code Cong. & Admin.News, p. 1569.

It is our conclusion that making an identical copy of a recorded version of a copyrighted musical composition is not a "similar use" as permitted by the compulsory license provisions of § 1(e). Therefore, the judgment of the district court will be vacated, and the case remanded for further proceedings consistent with this opinion.

GIBBONS, Circuit Judge (dissenting):

The issue of statutory interpretation presented by this case is of limited practical effect because of the combined effects of 17 U.S.C. § 1 et seq., Pub.L. No. 92–140, §§ 1(a), 2, 85 Stat. 391 (Oct. 11, 1971), and the recent decision in Goldstein v. California, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973). The new statute creates a limited copyright in sound recordings of musical compositions which were ".fixed" (first recorded) after February 15, 1972. The *Goldstein* case holds that the states may afford protection for sound recordings "fixed" at any time under state unfair competition laws. Thus the unwarranted interpretation of the Copyright Act of 1909 will not have widespread economic impact. It is, nevertheless, quite clearly wrong, and the error in construction of the statute cannot be cured by pejorative refer-

ences to the appellees as "pirates" rather than "licensees."

Congress first extended federal copyright protection to original musical compositions in 1831. Act of Feb. 3, 1831, ch. 16, 4 Stat. 436. The Copyright holder had the exclusive authority to sell copies (i. e. printed sheet music) of the musical score. However between 1831 and 1909, numerous machines were invented which allowed the composition to be reproduced mechanically. The mounting sale of player piano rolls and gramophone records detracted from the value of the copyright granted for the musical composition since anyone in possession of such modern innovations had little need for a copy of the sheet music. In response, Congress began in 1905 to consider a thorough revision of the copyright laws. The necessity for legislative revision was highlighted by the decision in White-Smith Music Publishing Co. v. Apollo, 209 U.S. 1, 28 S.Ct. 319, 52 L.Ed. 655 (1908). The Apollo Company had manufactured piano rolls capable of reproducing mechanically, compositions covered by a copyright owned by appellant. Appellant, the assignee of the composer, contended that the piano rolls constituted "copies" of the copyrighted composition, and that their sale, without permission, constituted an infringement of the copyright. The Court held that neither piano rolls nor records were "copies" of the copyrighted composition, within the meaning of the federal copyright statutes, but merely component parts of a machine which executed the composition. 209 U.S. at 18, 28 S.Ct. 319. Despite the fact that the piano rolls employed the creative work of the composer, all protection was denied.

Thereafter Congress determined that the copyright statutes should be revised to insure that composers of original musical works received adequate protection to encourage further artistic and creative effort. The Supreme Court in

Conn.L.Rev. 204, 234 n. 102 (1972). For another commentary on the 1971 amendment, *see* Schrader, Sound Recordings: Protection

Under State Law and Under the Recent Amendment to the Copyright Code, 14 Ariz.L. Rev. 689 (1972).

Goldstein v. California, *supra* analyzing the historical background to the Act of 1909 admonishes us:

"To interpret accurately Congress' intended purpose in passing the 1909 Act . . . we must remember that our modern technology differs greatly from that which existed in 1909. The Act and the [House] report should not be read as if they were written today, for to do so would inevitably distort their intended meaning; rather, we must read them against the background of 1909, in which they were written." 412 U.S. at 564, 93 S.Ct. at 2313.

Under § 1(e) of the Copyright Act of 1909 records and piano rolls were thereafter to be considered as "copies" of the original composition, and could not be manufactured unless payment was made to the copyright holder of the composition. However the *Goldstein* decision in analyzing the 1909 Act noted that

"Composers were to have no control over the recordings themselves. Nowhere does the [House] report indicate that Congress considered records as anything but a component part of a machine, capable of reproducing an original composition, or . . . as *renderings of* [an] *original artistic performance* . . . ." 412 U.S. at 566, 93 S.Ct. at 2314 (emphasis in original).

As enacted in 1909, § 1(e) of the Copyright Act, 17 U.S.C. § 1 et seq. reads in pertinent part:

"*Provided* . . . as a condition of extending the copyright control to such mechanical reproductions, that whenever the owner of a musical copyright has used or permitted or knowingly acquiesced in the use of the copyrighted work upon the parts of instruments serving to reproduce mechanically the musical work, any other person may make similar use of the copyrighted work upon the payment to the copyright proprietor of a royalty of 2 cents on each such part manufactured, to be paid by the manufacturer thereof . . . ."

Section 101(e) of the Copyright Act, 17 U.S.C. § 101(e) provides in pertinent part:

"*Interchangeable parts for use in mechanical music-producing machines.—* Interchangeable parts, such as discs or tapes for use in mechanical music-producing machines adapted to reproduce copyrighted musical works shall be considered copies of the copyrighted musical works which they serve to reproduce mechanically for the purposes of this section 101 and sections 106 and 109 of this title, and the unauthorized manufacture, use, or sale of such interchangeable parts shall constitute an infringement of the copyrighted work rendering the infringer liable in accordance with all provisions of this title dealing with infringements of copyright and, in a case of willful infringement for profit, to criminal prosecution pursuant to section 104 of this title."

Thus, under § 1(e), after the owner of the copyright in a musical composition has authorized its use in the manufacture of parts of instruments [i. e. piano rolls, records, tapes] "any other person may make a similar use . . . ." This is the so-called "compulsory license" provision upon which defendants relied. This provision was added to the Act when, during the course of congressional hearings in 1909, Congress learned that one dominant piano roll company, anticipating the establishment of an exclusive licensing right, had contracted with the leading music publishers for the exclusive right to record all their music. To forestall the danger that one company would acquire a monopoly in the making of piano rolls and records by acquiring the copyrights of musical compositions, the draftsmen adopted the device of the compulsory license. The compulsory license provision precluded the growth of a music monopoly by insuring that once a copyright owner licensed another to produce an original recorded performance of his work, other manufacturers would have access to that composition to make a "similar use" of it.

In construing the parameters of protection afforded to holders of copyrighted musical compositions the trial court recognized the limited nature of the rights granted by Congress. The exclusive right granted by the Act to composers was recognized to be "exclusive" only to the extent that the copyright holder did not permit any recording to be made of his song. However once an original sound recording of that composition had been licensed, the owner of the copyright composition lost further control over anyone who made a "similar use" of that composition under the compulsory license provision. The power of the copyright holders to restrict the use of the composition upon its licensing for an original recording from further reproduction by third parties was not envisaged by the Act.

Appellants argue that their claim is not based on a property interest in the recordings, and concede that recordings were not made the subject of copyright protection under the Act. They contend that as the copyright owners in the underlying musical compositions embodied in the original recordings, they have a copyright interest in the composition which extends beyond the original recording. Under this view the protectable interest in the composition is lost through the compulsory license provision only when a third party produces and manufactures his own sound recording from scratch (i.e. from the copyrighted sheet music) rather than from an unauthorized duplication of that composition already embodied in an original sound recording. Rather than the limited extent of copyright protection attributed to the Act by the trial court, the appellants contend they own an exclusive right to determine the use made of their copyrights in the musicial composition.

The crucial and narrow question upon which this appeal turns lies with the construction of the compulsory license provision. The appellants argue that this provision is a limited exception to the copyright owner's exclusive right, and as a proviso to the copyright interest, it should be construed narrowly. In this regard appellants argue in favor of the construction given the provision in Aeolian Co. v. Royal Music Roll Co., 196 F. 926 (W.D.N.Y.1912) and followed recently in two circuit court decisions: Duchess Music Corp. v. Stern, 458 F.2d 1305 (9th Cir.), cert. denied, 409 U.S. 847, 93 S.Ct. 52, 34 L.Ed.2d 88 (1972); Edward B. Marks Music Corp. v. Colorado Magnetics, Inc., 497 F.2d 285 (10th Cir. 1974), petition for cert. filed, (No. 73–2006, July 10, 1974). See also Fame Publishing Co., Inc. v. S. & S. Distributors, Inc., 363 F.Supp. 984 (N.D.Ala.1973).

In *Aeolian*, a piano roll manufacturer having a license to use certain copyrighted musical compositions on its perforated rolls sought an injunction against a competitor who was duplicating the rolls. In granting the injunction the court stated

"The provision of the statute (section 1e) that 'any other person make similar use of the copyrighted work' becomes automatically operative by the grant of the license; but the subsequent user does not thereby secure the right to copy the perforated rolls or records. He cannot avail himself of the skill and labor of the original manufacturer of the perforated roll or record by copying or duplicating the same, but must resort to the copyrighted composition or sheet music, and not pirate the work of a competitor who had made an original perforated roll." 196 F. at 927.

In *Duchess Music* the Ninth Circuit reversed the trial court, and following *Aeolian* concluded that defendant could not invoke the compulsory license provision as sanction for her activities.

"The statute provides that anyone who properly invokes the license provision 'may make *similar use* of the copyrighted work.' (emphasis supplied). Rosner admits that she duplicates appellants' copyrighted compositions. She does not make 'similar use' of them, she makes exact and identical copies of them. This is clearly outside the scope of the compulsory license scheme." 458 F.2d at 1310.

Similarly, in *Marks Music*, the Tenth Circuit in affirming the trial court's decision stated:

"This means, to us, that one who complies with royalty payment called for by the statute, though not having any authorization from the copyright owner, may nonetheless then 'use,' not a third party's record, but the copyrighted composition, which has been characterized as the 'raw material,' in a manner 'similar' to that employed by the recording company which did have authorization from the copyright owner. There is, of course, nothing in the statute which affirmatively authorizes Magnetics to duplicate and copy the recording of one licensed by the copyright owner to reproduce his composition. However, under the statute Magnetics may 'use' the copyright composition in a manner 'similar' to that made by the licensed recording company. All of which means, to us, that Magnetics may make its own arrangements, hire its own musicians and artists, and then record. It does not mean that Magnetics may use the composer's copyrighted work by duplicating and copying the record of a licensed recording company. Such, in our view, is not a *similar* use." 497 F.2d at 288.

Judge Lacey concluded that *Aeolian* and *Duchess* had been wrongly decided (*Marks* was decided later). 351 F.Supp. at 578–579. *Aeolian* was wrongly decided, since the compulsory license provision dictated that there be no exclusive license, and to allow a licensee to sue is incompatible with that provision. The practical effect of the decision is to give the licensee a copyright in his record, something Congress clearly had not intended to do.

Properly analyzed, there are three component parts in an original sound recording:

1. the musical composition
2. the performance
3. the recording itself.

Neither the performance, nor the recording itself were afforded copyright protection under the 1909 Act. As to the musical composition Professor Nimmer, in his leading treatise *Copyright* has stated:

"Once such a recording has been authorized, thereafter the right to record becomes non-exclusive, subject to the terms and conditions of the compulsory license provision of Sec. 1(e)." § 108.3, at 420–21 (1972).

"All of the other elements contained in the original record which he has without authority duplicated are not copyrightable, and hence his use of such other elements does not give rise to an action for copyright infringement." § 108.4621, at 431–32 (1972).

Nimmer thus concludes:

"Assuming such a record pirate duly serves a notice of intent to use, and pays the compulsory license royalties, the somewhat astounding result is that . . . he is not an infringer under the Copyright Act." § 108.4621, at 431 (1972).

This view is reinforced by the Supreme Court's recent opinion in Goldstein v. California, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973), which Judge Lacey considered in his second opinion reported at 362 F.Supp. 488. To fill the void in the federal copyright law, many states had enacted criminal statutes proscribing "pirating" activities. The difficulty with such legislation was its constitutionality under the pre-emption doctrine. The Court, applying a *Cooley* approach, concluded that the states were free to legislate in the area, since certain subject matter to which the copyright clause of the constitution is addressed, may be of local importance, "and not worthy of national attention or protection." 412 U.S. at 558, 93 S.Ct. at 2310. Implicit in the Court's holding is the necessary conclusion that the Copyright Law provided no federal remedy to either the composer or his licensee-manufacturer. If Congress had seen fit to

provide a remedy for infringement to the composer or the manufacturer under the 1909 Act, the Court could not consistent with its *Cooley* analysis, have permitted the states to legislate in the area.

Finally, Judge Lacey's conclusion is supported by the legislative history behind the Copyright Act's 1971 Amendment, Pub.L. No. 92–140, §§ 1(a), 2, 85 Stat. 391, 17 U.S.C. § 1 et seq. (October 11, 1971). Proposed revision of the Act began in 1955, and this amendment was designed as an interim measure prior to final revision sometime in 1975. The amendment created a limited copyright in sound recordings of musical compositions which were "fixed" (first recorded) *after* February 15, 1972. Congress on the basis of lengthy public hearings at which it heard testimony from the various elements in the music industry as well as those governmental agencies charged with the responsibility of administering the Act concluded that under the existing law:

"If the unauthorized producers pay the statutory mechanical royalty required by the Copyright Act for the use of copyrighted music *there is no Federal remedy currently available* to combat the unauthorized reproduction of the recording . . ."

1971 U.S.Code Cong. & Admin.News at p. 1567 (emphasis added) (quoted in *Jondora,* 351 F.Supp. at 582).

Judge Lacey properly considered the language and legislative history of the 1909 Act, the views of the leading text writers, the analysis of the conflicting opinion in the Ninth Circuit (later followed in the Tenth Circuit), the impact of the *Goldstein* decision, and the remedy afforded by the 1971 Amendment. It is apparent that both the Ninth and Tenth Circuits have attempted to provide a remedy which was not envisaged by the 1909 Act. We should not follow like the children of Hamelin their erroneous piping. The appropriate response to this problem lies in the hands of the Congress when it considers the final revision of the Copyright Law. The judgment below should be affirmed.